# NEW YORK MUTUAL LIFE INSURANCE COMPANY *v.* ARMSTRONG, Administratrix.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

Argued March 16, 17, 1886.—Decided April 5, 1886.

A policy of life insurance payable to the assured or his assigns at a future day named, or if he should die before that day to his legal representatives within sixty days after notice and proof of his death, is assignable if the assignment is not made to cover a speculative risk; and an assignment of it passes to the assignee the right to receive the sum insured in case of the death of the assured before the day named.

Proof that the assignee of a policy of life insurance caused the death of the assured by felonious means is sufficient to defeat a recovery on the policy.

In a suit brought by an assignee of a policy of life insurance, obtained on the application of the assured at the instigation of the assignee, to recover of the insurers after the death of the assured, the defendants set up that it was plaintiff's purpose, in procuring the insurance to be obtained, to cheat and defraud defendants, and offered to show that he effected insurances upon the life of the assured in other companies at or about the same time for the like fraudulent purpose: *Held*, That the evidence was admissible.

On the 8th of December, 1877, the Mutual Life Insurance Company of New York issued a policy of insurance on the life of John M. Armstrong, of Philadelphia, for $10,000. It was what is known as an endowment policy; that is, a policy payable to the assured if he live a designated time, but to some other person named if he die before the expiration of that time. It was payable, subject to certain conditions, to the assured *or his assigns* on the 8th of December, 1897, at the office of the company in New York; or, f he should die before that time, to *his legal representatives,* within sixty days after notice and proof of his death. It recited that it was issued in consideration of his application, and of the statements contained therein, which, whether written by his own hand or not, every person accepting or acquiring any interest in the contract adopted and warranted to be true, and the only statements upon which the contract was made; and in further consideration of the payment of $138.60 quarterly each year during the continuance of the policy.

On the 25th of January, 1878, Armstrong died, and his widow was appointed administratrix of his estate. The required notice and proof of his death were furnished, and the insurance money not being paid, she brought this action for its recovery in a court of the State of New York, and, on motion of the company, it was removed to the Circuit Court of the United States.

The company set up several special defences to the action. One of them was, that the policy was obtained by one Benjamin Hunter, with the intent to cheat and defraud the company by compassing the death of the assured by felonious means and collecting the amount of the insurance, and which he attempted to carry out by causing his death; another was, that the statements made in the application of the assured as to previous insurances upon his life were false, the amounts being much larger than those stated.

On the trial it appeared in evidence that on the 3d or 4th of December, 1877, Hunter made some inquiries at the office of the company in Philadelphia as to the rates of insurance on the life of a person aged forty or forty-one years upon an

endowment policy of twenty years, stating that he thought of insuring for his own benefit the life of a person in the sum of $10,000. After some conversation on the subject of insurance generally, he left, stating that the person to be insured would probably call in a day or two. On the 5th of the month Armstrong called, and informed the agent that he came at the request of Hunter to make application for a life insurance. He was thereupon examined, and after answering the questions usually propounded to applicants, and among others those in relation to existing insurances on his life, he signed a formal application, leaving, however, blank the place for the amount of the insurance which he desired, and for the answer to the question touching the payments of the premium. He also executed an assignment of the policy, leaving blanks for its date and for that of the policy, and for the name and residence of the assignee. This was his entire connection with the transaction. In the afternoon of the same day, or on the following morning, Hunter informed the office that the amount of the insurance desired was $10,000, and that it would be more convenient for him to pay the premiums quarterly. The term "quarterly" and the sum "$10,000" were, therefore, upon his instructions, inserted in the application, which was then sent to New York and the policy was there executed by the company. Before the receipt of the policy in Philadelphia he visited the office, and stated that, as he intended to leave the city and be absent for some time, he would pay the premium, and that his lawyer would call for the policy. He accordingly paid the stipulated premium, and the fee for the policy. Some days afterwards his lawyer received the policy and also the assignment, which was attached, the blanks having been filled. They were subsequently delivered to Hunter, and were found in his possession at his death.

Within six weeks after the policy was issued Armstrong was attacked at night in a street in Camden, New Jersey, and received blows on his head which fractured his skull, from the effects of which he died two days afterward. Suspicion fell upon Hunter as the perpetrator or instigator of the attack. He was accordingly arrested, and was indicted and tried for the

murder of Armstrong in one of the courts of that State, and was convicted. He was sentenced to death, and was hanged. By stipulation the testimony of any living witness might be read from the record of his testimony in that case, with like effect as if he were present and testified in this action, subject to all legal objections to its relevancy, competency and materiality. As the first step in proof of the defence that the policy was obtained to cheat and defraud the company, the defendant offered to read from that record the testimony of a witness to show that Hunter, being at the time the sole owner of the policy, intentionally caused the death of Armstrong; but the court, upon objection of the plaintiff, excluded the testimony, and an exception was taken. The defendant offered in different forms to make this proof, but the court refused to receive it, accompanying its ruling in one instance with this statement to counsel: "I will take your offer as broad as you choose to make it; that you offer the testimony to prove that Hunter procured the application for the policy on Armstrong to be made, and that he did so for the purpose of having the insurance effected, and then disposing of Armstrong, and then getting the money; make it as broad as that, and I will exclude it."

The defendant also offered to prove that, about the time the policy in suit was issued, Hunter, with like fraudulent intent, obtained policies of insurance in two other companies upon the life of Armstrong, one made directly to himself, and the other to Armstrong, with an assignment executed simultaneously to himself, and that he paid the premiums thereon.; one of the policies being for $10,000 and the other for $6000; but upon the objection of the plaintiff the testimony was excluded, and an exception taken.

The court, among other things, instructed the jury, in substance, that the contract of insurance was divisible; that the last part, providing for the payment of the insurance money to the *legal representatives* of Armstrong in case he should die before the expiration of the policy, was not assignable; that his assignment only transferred the interest, payable at the expiration of the policy; and that the plaintiff was his legal repre-

sentative, entitled to the policy and to whatever was due upon it. The defendant excepted. A verdict for the full amount of the policy, with interest, was rendered, and judgment entered thereon. 20 Blatchford, 493.

*Mr. Joseph H. Choate* for plaintiff in error.

*Mr. Herbert T. Ketcham* for defendant in error. *Mr. George M. McKellar* was with him on the brief.

I. Neither the assignment nor its duplicate was the act of Armstrong. Proof, sufficient to sustain a finding, was submitted to the jury that he never executed either paper, never authorized their execution, and never made or sanctioned any delivery of either paper; that whether he gave any authority for the delivery or not, no delivery was made; and that any delivery, if made, was void for fraud. The verdict must be assumed to embrace in its general finding a conclusion upon conflicting evidence that no delivery was in fact made. Could the jury have found that the completion of the paper and its delivery were authorized by Armstrong, they must also have found that the paper, though delivered, was induced by fraud, practised upon Armstrong by Hunter. The plaintiff in error by its several answers, offers to prove, requests to charge, and present argument, asserts that from the issuing of the policy to the death of Armstrong, Hunter maintained the fraudulent intent to secure the ownership of the policy, to murder Armstrong, and to collect the funds of the insurance. It was essential to this scheme that the policy should be assigned to him; and an assignment obtained for such purposes must be void, as having been obtained by fraud.

II. The proposition that the policy in suit was a contract between Hunter and the company, and, as such, was void for Hunter's fraud, will not be entertained by this court; since the verdict of the jury has already been shown to embrace a finding that Hunter never took any relation whatever to the contract of insurance.

In the face of the verdict, an inquiry into Hunter's conduct, intentions and transactions is immaterial, for they cannot affect

the policy if it be held that they did not bring him into relations with it. The contract was in writing, Armstrong and the company were the sole contracting parties. Extrinsic evidence cannot be allowed to vary this. *Rawls* v. *American Mutual Life Ins. Co.*, 27 N. Y., 282, and *Lawrence* v. *Fox*, 20 N. Y. 268, are not like this case. The familiar rule that instruments simultaneously executed may be construed together is not applicable, except when the contracts are between the same parties.

III. Hunter's fraud cannot be imputed to Armstrong on the theory that he was Armstrong's agent. The answer alleges no fraud on the part of Armstrong.

IV. Conceding that policies of life insurance are assignable, we respectfully submit as the result of the authorities that the policy in question, so far as it contained assurance in the event of death, was an *irrevocable settlement.* The insurance when proposed was subject to Armstrong's complete right of disposition, and he could have preserved the right of assignment. But when he directed its payment to his "legal representatives," he exhausted this right and parted with that which until then had been in his control. How many times must he be permitted to part with it to satisfy his right of disposition? See *Worley* v. *N. W. Masonic Association*, 13 Reporter, 233; *Kelly* v. *Mann*, 13 Reporter, 12; *Greeno* v. *Greeno*, 23 Hun, 478.

V. As to the alleged misstatements of Armstrong it was an affirmative defence which should have been pleaded. *Piedmont & Arlington Ins. Co.* v. *Ewing*, 92 U. S. 377; N. Y. Code Civil Procedure, § 500; *Murray* v. *New York Life Ins. Co*, 85 N. Y. 236. Where the statements are not vouched for as absolutely and subjectively true, they affect the validity of the insurance only to the extent to which they in fact induce the contract; for the applicant is bound not by an express engagement but by the general law of morals which governs every transaction, and his policy is not to be avoided save for statements which are made with the knowledge of their untruth and the intent to deceive. In one instance, deviation from existing fact is a *breach of contract.* In the other, it is nothing unless fraudulent. *Moulor* v. *Am. L. Ins. Co.*, 111

U. S. 335, and cases cited. The contract in this case is precisely within the rule established in *Moulor* v. *Ins. Co.*

MR. JUSTICE FIELD, after stating the case as above reported, delivered the opinion of the court.

From the charge of the court, and its opinion on the motion for a new trial, 20 Blatchford, 493, it appears that the refusal to admit testimony of Hunter's fraudulent purpose in procuring the policy, and his feloniously causing, whilst the sole owner of it, the death of the assured, was founded upon the assumption that the insurance money, payable in case the death occurred before the expiration of the policy, went to the legal representatives of the assured, and was not assignable, and that the assignment not taking effect Hunter had no interest in the policy, and, therefore, if he did feloniously cause the death, the fact could have had no effect in controlling the payment.

Assuming this to be the reason for excluding the evidence offered, the ruling cannot be upheld. The position that the assignment did not take effect, because the assured died before the expiration of the policy, is untenable. The provision for payment in such case to his legal representatives was intended to meet the contingency of his dying without having disposed of his interest, and not to limit his power over the contract during his life, and pass the insurance to those who should represent him after his death. The term "legal representatives" is not necessarily restricted to the personal representatives of one deceased, but is sufficiently broad to cover all persons who, with respect to his property, stand in his place and represent his interests, whether transferred to them by his act or by operation of law. It may, in this case, include assigns as well as executors and administrators. *New York Life Insurance Co.* v. *Flack*, 3 Maryland, 341.

A policy of life insurance, without restrictive words, is assignable by the assured for a valuable consideration equally with any other chose in action, where the assignment is not made to cover a mere speculative risk, and thus evade the law against wager policies; and payment thereof may be enforced for the benefit of the assignee, and, under the system of pro-

cedure in many States, in his name. *Warnock* v. *Davis*, 104 U. S. 775, 780; *Archibald* v. *Mutual Ins. Co. of Chicago*, 38 Wis. 542, 545; *De Ronge* v. *Elliott*, 8 C. E. Green (23 N. J. Eq.), 486, 495. The assignee here, Hunter, represented that he was the special partner of Armstrong, and had placed $5000 in the partnership, and was apprehensive that he might be charged as a general partner. If he was a special partner the contract was not a wager policy. And as it was not a contract for the benefit of the wife of the assured, it does not fall within those cases where, for the protection of the beneficiary, the power of the assured to divert the course of payment is restricted.

The assignment conveying to Hunter the whole interest of the assured, his representatives alone would have a valid claim under it, if the policy were not void in its inception. Proof, therefore, that he caused the death of the assured by felonious means must necessarily have defeated a recovery; and the court erred in refusing to admit testimony tending to prove that such was the fact.

The theory of the defence is, that the purpose of Hunter in obtaining the insurance was to cheat and defraud the company. In support of that position evidence that he effected insurances upon the life of Armstrong in other companies at or about the same time, for a like fraudulent purpose, was admissible. A repetition of acts of the same character naturally indicates the same purpose in all of them; and if when considered together they cannot be reasonably explained without ascribing a particular motive to the perpetrator, such motive will be considered as prompting each act. A creditor has an insurable interest in the life of his debtor, and may very properly procure an insurance upon it for an amount sufficient to secure his debt, but if he takes out policies in different companies at or nearly the same time, and thus increases the insurance far beyond any reasonable security for the debt, an inquiry at once arises as to his motive, and it may be considered as governing him in each insurance. In *Castle* v. *Bullard*, 23 How. 172, 186, where the defendants were charged with having fraudulently sold the goods of the plaintiff, evidence that they had committed similar

fraudulent acts at or about the same time was allowed, with a view to establish their alleged intent with respect to the matters in issue.   The court said : " Similar fraudulent acts are admissible in cases of this description, if committed at or about the same time, and when the same motive may reasonably be supposed to exist, with a view to establish the intent of the defendant in respect to the matters charged against him in the declaration." In *Lincoln* v. *Claflin*, 7 Wall. 132, an action was brought for fraudulently obtaining property, and evidence of other frauds of a like character, committed by the defendants at or near the same time, was held to be admissible.   " Its admissibility," said the court, " is placed on the ground that where transactions of a similar character executed by the same parties are closely connected in time, the inference is reasonable that they proceed from the same motive.   The principle is asserted in *Cary* v. *Hotailing*, 1 Hill, 311, and is sustained by numerous authorities.   The case of fraud, as there stated, is among the few exceptions to the general rule that other offences of the accused are not relevant to establish the main charge." In *Butler* v. *Watkins*, 13 Wall. 456, 464, speaking on the same subject, this court said : " In actions for fraud large latitude is always given to the admission of evidence.   If a motive exist prompting to a particular line of conduct, and it be shown that in pursuing that line a defendant has deceived and defrauded one person, it may justly be inferred that similar conduct towards another, at or about the same time and in relation to a like subject, was actuated by the same spirit."   In *Bottomley* v. *United States*, 1 Story, 135, 144, Mr. Justice Story held the same doctrine, and cited several instances of its application. Thus, in the case of a prosecution for uttering counterfeit money, the fact that the prisoner has in his possession, or has uttered, other counterfeit money, is held to be proper evidence to show his guilty knowledge ; and upon an indictment for receiving stolen goods, evidence that the prisoner had received at various other times different parcels of goods which had been stolen from the same persons is held admissible in proof of his guilty knowledge.   So, on an indictment for a conspiracy to create public discontent and disaffection, proof is admissible against

the prisoner that at another meeting held for an object profes-sedly similar, at which the prisoner was chairman, resolutions were passed of a character to create such discontent and disaffection. "In short," said the learned justice, "wherever the intent or guilty knowledge of a party is a material ingredient in the issue of a case, these collateral facts, tending to establish such intent or knowledge, are proper evidence. In many cases of fraud it would be otherwise impossible satisfactorily to establish the true nature and character of the act." Many other authorities might be cited to the same purport.

The evidence offered that Hunter obtained insurances in other companies on the life of Armstrong at or near the same time, was, under these authorities, clearly admissible. It tended to establish the theory of the defendant that the insurance in this case was obtained by Hunter upon the premeditated purpose to cheat and defraud the company. Especially would it have had that effect if followed by proof of the manner of the death of Armstrong.

But, independently of any proof of the motives of Hunter in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had wilfully fired.

This view renders it unnecessary to consider the effect upon the policy of the statements, made in the application of the assured, as to the amount of other insurances on his life.

*Judgment reversed, and cause remanded for a new trial.*

MR. JUSTICE MATTHEWS did not sit in this case nor take part in its decision.