GEORGE WILKINSON, receiver,

*v.*

DANIEL DODD et al.

Charges in a bill that the managers of a savings institution petitioned the court, showing financial embarrassment, and asking the aid, direction, and protection of the court, and that they accepted an order from the court based

Wilkinson v. Dodd.

on such petition, and that they proceeded to manage the affairs of the institution under said order and the law of the land; and charges of what the duty of said managers was, under the charter, to the law and to said order, and that, in repeated instances, the said managers, or some of them as a committee or as agents of the rest, made several illegal loans, from which, however, no loss resulted, which illegal loans all had knowledge of or ought to have had, even though they did not join in making them, and that they were guilty of negligence if they did not know; and that afterwards some of said managers made a loan to Fisk & Hatch, which was illegal and which resulted in loss; followed by a prayer that all of said managers may be held liable for the loss because of committing such illegal act, or because of their negligence in permitting it to be committed. *Held*, that such charges showing the condition of the institution and the unlawful management of it, prior to the time when the act was committed from which loss resulted, are not impertinent or scandalous.

On exceptions to bill.

*Mr. F. W. Stevens*, for complainant.

*Mr. John O. H. Pitney*, for H. B. Darcy.

*Mr. John W. Taylor*, for Baldwin and others.

*Mr. George W. Hubbell*, for Miller and others.

*Mr. Henry Young*, for Shorley & Young.

*Mr. C. Borcherling*, for Reeves's executors.

*Mr. F. Frelinghuysen*, for Mercer.

*Mr. John R. Emery*, for Dodd and others.

*Mr. Thomas N. McCarter*, for Dodd and others.

BIRD, V. C.

This cause has been before the court on demurrers to the bill; demurrers general and special for misjoinder. The principal allegations of the bill appear in the discussions of the issues raised by such demurrers (see *Wilkinson* v. *Dodd, 13 Stew. Eq.*

*123*), and they will not be repeated here. The rights of the complainant, under such allegations, have been settled by the court of errors and appeals. *Dodd* v. *Wilkinson, 14 Stew. Eq. 566.*

Now the cause is before the court on exceptions to portions of the bill; the exceptions are twenty-three in all. The portions excepted to are said to be scandalous or impertinent.

Before stating the exceptions, in order that they may be better understood, I will state that the main purpose of the bill is to charge all the managers of the Newark Savings Institution with the loss which resulted from an illegal loan of a large number of the securities of said institution, to Fisk & Hatch, by a portion only of said managers, without explicit directions from all of them as a body. Other illegal loans had been made prior to this one to Fisk & Hatch, but no loss resulted therefrom. These illegal loans were made with the distinct charge that they became known to all of said managers, or ought to have been known by them, and that it was their duty to interpose and prevent any similar loans; but, failing so to do, they were guilty of such negligence as to render them liable for the losses which thereafter resulted from such illegal loans. Among others, the allegations respecting these illegal loans are excepted to. The other allegations which are excepted to show the greatest necessity for caution and circumspection on the part of the managers, and consequently increase the demand for the highest watchfulness, and also an increased legal liability.

The first exception is to the allegation that on the 12th of December, 1877, the said institution, by petition, showing its assets, and stating the depreciation of its securities, and expressing the belief that it would not then be able to pay all of its depositors in full, prayed an order of this court restraining said managers from paying more than eighteen per cent. to any depositor until the further order of the court, and that all deposits thereafter made should be treated as special deposits, and that its future management might be under the control of the court.

The second exception is to the allegations setting forth the order made by the court upon said petition, and in accordance with its

prayers creating the special deposits, and granting the injunction. This order, so set forth, covers about one page and a half.

The third exception is to the allegation that afterwards the said institution realized enough to pay the depositors, who were such prior to December 12th, 1877, ninety-five per cent. of their claims.

The fourth exception is to the allegations that a new account was at once opened under the title of special deposits, and that deposits were made thereunder until the 15th of May, 1884; that said deposits were invested by the managers according to the directions of said order, but finding it difficult to invest all, on the 2d of June, 1880, they asked leave and obtained an order allowing investments on bond and mortgage of fifty per cent. of the new deposits, giving the restrictions contained in the order.

The fifth exception is to the allegations which declare that the institution had no power to issue stock, and that it had no capital other than the deposits, and that its managers were entitled to no part of its earnings for services, except as they might claim it as depositors under the act creating its charter, and that all of its assets, after payment of its debts, belonged exclusively to its depositors, and that the managers were the trustees of said institution and of its depositors, and received compensation for their services as such.

The sixth and seventh exceptions are to the allegations that in the year 1881, the managers began to loan money in deliberate disregard of said order and of the statute regulating savings banks; and that large portions of the money on the new account had been invested in government bonds, recognized as amongst the best of securities, but that they were sold and the proceeds loaned, either on collateral security or without any; and that often these securities were such as were not sanctioned by any law nor by the order of the court; and that such collaterals were often left under control of the borrower; and that the losses which resulted, as in the bill thereafter stated, were the natural and legitimate consequences of this mode of dealing with the assets of the institution.

The eighth and ninth exceptions are to the allegations that on

the 22d of August, 1881, the managers lent to Fisk & Hatch, brokers in the city of New York, $500,000, and took as security government bonds, which were at first kept in the vaults of said institution, at Newark, but afterwards unlawfully lent or intrusted to the borrowers (Fisk & Hatch), to whom was given the exclusive possession and control, with the right to exchange them, at the discretion of Fisk & Hatch, for other collaterals.

The tenth exception is to the allegation that on the 13th of May, 1882, said managers lent to Joseph A. Halsey $70,000 on stocks of a gas company and two banks, naming them.

The eleventh exception is to the allegation that on the 13th of May, 1882, said managers lent to Stephen H. Condit $85,000 on the stock and bonds of several banks, naming them, and of insurance companies, and of railroad companies, and of a gas company, and of an ice and coal company.

The twelfth and thirteenth exceptions are to the allegation that on the 26th of April, 1883, said managers lent to E. H. Harriman & Co., of New York, $800,000, and took notes of said firm, payable in eleven months, secured by stock of a large number of railroads, all being foreign corporations.

The fourteenth exception is to the allegation that the money thus loaned was, in March, 1884, converted temporarily into bonds of the United States, which, about April 3d following, were again sold, and $801,375 loaned to said E. H. Harriman & Co., on securities similar to those above given.

The fifteenth exception is to the allegation that all of these loans, except that to Harriman, could have been called in at any time on short notice; and that it is pretended by the managers, or some of them, that these loans were made by Daniel Dodd, the president, or some other member or members of the funding committee, and without their knowledge or consent; and to the charge that the sole purpose of said institution was the safe investment of the savings of those who, by reason of their humble condition in life or ignorance of business matters, were unable properly to invest for themselves, and that the said managers were, as a body, charged with the duty of making and caring for such investments, and that they held themselves out to the

public, by advertisements and otherwise, as being so charged, and that it was their duty, as agents and trustees of said depositors, to invest and keep their deposits in a prescribed mode, and not to abdicate their functions or to impose duties upon one or more of their number, which had been, by their charter and by-laws, devolved upon the entire board ; and to the further charge that if said managers committed to a single manager the execution of the duties resting upon them all, such manager became their agent as well as the agent and trustee of the depositors, and that said managers are responsible for his negligent acts ; and to the further charge that said managers could not commit the management of said institution or of its funds and assets, to a single member without being themselves guilty of gross negligence and breach of trust, and that if they did so they are responsible for any loss that may ensue ; and to the further charge of negligence on the part of the funding committee and of the auditing committee, and of their liability for the acts of their agents.

The sixteenth exception is to the allegation that if any of said managers did not concur in making such illegal loans, they had full knowledge of them after they were made, or ample means of knowledge from the books of the institution and from reports, both written and verbal, made at the meetings of the board, and from statements made to the secretary of state, and that they had the same knowledge or means of knowledge of the loans of bonds and money in the bill afterwards mentioned, as of the ones already named, and that it was a gross breach of trust to permit the bonds and money so lent to remain illegally secured and outstanding after they had such knowledge or might have had, had they not been grossly negligent in seeking and obtaining requisite information.

The seventeenth exception is to the allegation that both by law and the order of this court these bonds constituted an investment of the funds of the institution, which it was the duty of the managers not to change or disturb, yet, in disregard of said orders, and of the statute, and of the law of the land—being only part of a sentence which is excepted to—the balance of said

sentence showing that the funding committee, on the 9th of August, 1882, passed a resolution in these words:

"The sale of four per cent. and four and a half per cent. bonds, at best rate, was agreed to, and the loaning of proceeds upon collateral ordered."

Which resolution was read at a meeting of the board the 13th of September, 1882, and which is given in this connection in order to show more fully what the pleader had in mind in that part of the paragraph which is next excepted to by the eighteenth exception, and which paragraph contains the portion last excepted to, and also said resolution.

The eighteenth exception is to the allegation that the aforesaid resolution was not only a violation of the aforesaid orders of this court, and of the law of the land, but it was also a direct violation of the act entitled "An act for the better security of depositors in savings banks," and the supplements thereto, inasmuch as it ordered the loaning of the proceeds of said bonds of the United States, whose market value considerably exceeded their par value, upon collateral security, to an amount greatly in excess of fifteen per cent. of the whole deposits held by said institution, and when, to the knowledge of said managers, more than said fifteen per cent. had already been loaned; and that from the time of the passage of said resolution to said 15th of May, 1884, the said funding committee, or some of them, with the consent of the said managers, constantly loaned from at least thirty per centum to fifty per centum of the total deposits of said institution on collateral security, in direct contravention of the said act, and that the fact that said illegal loans upon pledge of collaterals were being made was known to all the members of the board, and that all said members assented to the making of the same.

The nineteenth exception is to the allegation that said committee, or some of its members, had sold, of said four per cent. bonds, bonds to the amount of $200,000 (par value), and, two weeks afterwards, bonds to the amount of $220,000 (par value), and of said four and a half per cent. bonds, bonds to the amount

of $5,000 (par value), and that the said resolution of August 9th was intended to apply to and sanction said loans.

The twentieth exception is to the allegation that on the day of the sale of said bonds, to the amount of $200,000, viz., on the 8th of August, 1882, the proceeds of said sale, with other moneys, amounting in all to $350,000, were unlawfully lent to Victor Newcomb upon the pledge of certain railroad bonds of foreign corporations, and bonds of the United States of the par value of $10,000.

The twenty-first exception is to the allegation that on the day of sale of bonds of the United States to the amount of $225,000, viz., the 23d of August, 1882, $270,000 were unlawfully loaned either to the Merchants National Bank or to E. H. Harriman & Co., upon pledge of certain railroad securities, naming them, foreign corporations, which securities were allowed to remain with the said Merchants Bank and under their control.

The twenty-second exception is to the allegations that these two last-mentioned loans remain outstanding, when they were paid, and that the securities purporting to secure these loans were recorded in the books of the institution, and were known to, and seen by the auditing committee when they made their quarterly examination in January, 1883, and were returned in detail, under oath, by three of the members of that committee, to wit, Algernon S. Hubbell, Henry H. Miller and Francis Mackin, as well as by their president, Daniel Dodd, in their annual report to the secretary of state, made in that month.

The twenty-third exception is to the allegations that during all the time from January 1st, 1881, to the time when the bank ceased to do business, they constantly published in the newspapers, for the purpose of attracting new deposits, that they were acting under and pursuant to the special order of this court; and that by the fourth article of the by-laws, it was directed that the said funding committee should keep a minute of their proceedings, and report the same to the stated meetings of the board ; and that for twenty years prior to 1882, the said minutes contained a record of such transactions, but that after that time the more important loans and investments, and par-

16

Wilkinson *v.* Dodd.

ticularly the illegal loans mentioned in said bill, were not re-
corded in said minutes; that these minutes continued to be read
at the meetings of the board, and all the members of the board,
from statements handed them from the books, which were always
put upon the tables at said board meetings, pursuant to a reso-
lution set forth in the bill, had sufficient information respecting
such unrecorded transactions to put them upon inquiry, and that
their failure to prosecute such inquiry, that they might be able
to approve or disapprove the course of the committee in making
them, constitutes such negligence as makes them answerable for
all loss resulting from such failure on their part; and that by
the charter the said managers had a right to agree to all removals
and new appointments, by reason of which the depositors had no
control over said managers and no voice in the disposition of the
assets of said institution; and that by the charter the manage-
ment of said institution is entrusted to the whole board without
power to devolve its duties upon any member; and that said
depositors have a right to the judgment of the entire board as
to how the funds should be invested, and that if said board sees
fit to provide a particular committee to make investments, the
ultimate responsibility therefor lies with the board, the said com-
mittee being only the agent of the board.

The twenty-fourth exception is to the allegation showing that
in his dealings with Fisk & Hatch, complainant did not intend
to release the managers, and that Fisk & Hatch and the mana-
gers were severally and jointly liable.

I have thus given the substance of the matters excepted to,
because there is no certainty of a just conclusion without such
matters are before the mind.

The view which seems to me to be the correct one renders it
unnecessary for me, at this stage of the proceedings, to consider
separately the exceptions presented by the executors of Reeves,
or to make any distinction in their behalf, although their testa-
tor died before the main charge on which the bill rests. If I
am right in my conclusions, then most *especially* ought the
charges in the bill as to Reeves's negligence stand, for otherwise
there would be nothing upon which to found any liability

against his executors.  I take it that this must have been the judgment of the court of errors on this point.

Are the matters so set forth subject to exceptions because impertinent or scandalous?  In *Camden and Amboy R. R. Co.* v. *Stewart, 6 C. E. Gr. 484, 489,* in delivering the opinion of the court of errors and appeals, the chief-justice said: " It is always to be remembered that a bill in equity has a two-fold purpose. The first is to bring before the court and to put in issue the facts upon which the complainant's right to relief rests—thus far the bill is equivalent to a declaration in an action in the common law courts; but it is likewise an examination of the defendant for the purpose of obtaining evidence to establish the plaintiff's case, or to counterprove the defence which it is supposed may be set up in the answer.  I think, therefore, the general rule must be that the complainant must be permitted to set forth any fact, the admission of which by the defendant will go either to establish the complainant's own case, or overturn that of his adversary.  \* \* \*  The testimony sought for must in some way appear to be of use to the parties seeking it, otherwise it is useless in the case and serves but to cumber the record.  \* \* \* I fully concur in the views upon this subject of Mr. Vice-Chancellor Bruce, in *Davis* v. *Cripps, 2 Younge & Coll. 430, 443,* expressed in the following terms: ' The court in cases of impertinence ought, before expunging the matter alleged to be impertinent, to be especially clear that it is such as ought to be struck out of the record, for this reason: that the error on the one side is irremediable; on the other, not.  If the court strikes it out of the record, it is gone, and the party may have no opportunity of placing it there again; whereas, if it is left on the record and is prolix or oppressive, the court, at the hearing of the cause, has power to set the matter right in point of costs.' "  In the same case, in the court below, the chancellor's expressions were in harmony with those above expressed.  *4 C. E. Gr. 343.* See, also, *Mechanics Bank* v. *Levy, 3 Paige 606; Hawley* v. *Wolverton, 5 Id. 522.*  In this case, the court says the complainant may state any matter of evidence in the bill, or any collateral fact, the admission of which by the defendant may be

material in establishing the general allegations of the bill as a pleading, or in ascertaining or determining the nature or extent or the kind of relief to which the complainant may be entitled consistently with the case made by the bill, or which may legally influence the court in determining the question of costs. And where any allegation or statement contained in the bill may thus affect the decision of the cause, if admitted by the defendant or established by proof, it is relevant and cannot be excepted to as impertinent. Chancellor Kent, in *Woods* v. *Morrell, 1 Johns. Ch. 103*, says: "The best test by which to ascertain whether the matter be impertinent, is to try whether the subject of the allegation could be put in issue and would be matter proper to be given in evidence between the parties."

These principles must be my guide. Are the allegations excepted to material? Do they tend to establish the complainant's case? Are they pertinent to the main issue? What is the complainant's case, as made by the bill, supposing it to be complete, independently of the allegations excepted to? It is that the managers of this institution made illegal loans of the moneys and bonds of the institution to Fisk & Hatch, whereby loss resulted, and the prayer is that said managers may be decreed by their aforesaid negligence and illegal acts and breaches of trust, to have occasioned the loss suffered by said institution at the hands of Fisk & Hatch. The bill is aimed at all of the managers. But I learn from the bill that all of the managers did not join in the physical act of handing over the money and bonds to Fisk & Hatch, nor did they all join, by voice or vote, in directing them to be handed over. How then can they all be charged? It seems to me, only by showing that, although not present in person, and not seeing or hearing the acts or speech of the parties immediately engaged, they had such knowledge, or ought to have had, of many other similar transactions, recent or remote, as to render them liable to the charge of negligence in the principal act so complained of; only by showing that the institution had been placed in such imminent peril as to make it absolutely necessary for these same managers to invoke the aid of this court in averting the threatened storm, which occasion was a warning

that should not only never have been forgotten, but which was enough to arouse to the most constant vigilance; only by showing that they had been warned by repeated acts of their comanagers, most glaring and conspicuous for their illegality and disregard of law; only by showing that after this warning and after these illegal acts, the books of the institution, either by the record of events therein contained, or by the absence of such record, were daily advertising the illegal acts of the acting managers to the professed non-acting managers, and admonishing the latter to be up and doing for the salvation of their trust; only by showing, in these and other ways, that the non-acting managers were not only indifferent in the law as to their exalted trust, but turned their backs upon the light which would have unerringly led them to the truth, and walked in the darkness of ignorance from choice. It seems most clear that facts illustrating such principles can be proved to establish a charge of liability because of negligence. It seems equally clear that such facts are most pertinent. I cannot read any of the parts of this bill without some such important fact. No exception can prevail without striking from the record some material charge.

The argument is to the effect that it does not follow that the sentinel was asleep at his post on the occasion of a surprise and disaster, because he had repeatedly been caught sleeping before. True, but if there be no other way of accounting for the surprise and overthrow, then the fact of daily indulging in the drowsy habit will lend great strength to the already strong conviction. Certain it is that if the sentinel had been at his post and awake to his duty, there could not have been a surprise. The insistment is that every such illegal or fraudulent act is wholly independent of every other, and that there is no such thing as establishing the existence of the one because of the other, however much two or more of them may be similar, or however much they may spring from the same desires or conditions, or however much they may involve the same methods of accomplishing disaster and loss. While this is true ordinarily, it is not so universally. There are well-established exceptions, resting not only on high authority but on sound reasoning.

Although the question of correct pleading was not involved, a useful general principle is forcibly presented in the case of *N. Y. & N. H. R. R. Co.* v. *Schuyler*, *34 N. Y. 30*. One of the principal questions discussed was as to the liability of a corporation for the fraudulent issue of stock by one of its directors, who was also its agent. The court said: "A corporation is liable to the same extent and under the same circumstances as a natural person for the consequences of its wrongful acts, and will be held to respond, in a civil action, at the suit of an injured party, for every grade and description of forcible, malicious, or negligent tort or wrong which it commits, however foreign to its nature or beyond its granted power the wrongful transaction or act may be." *Id. 49*.

Again: "The law always imposes on every one who attempts to do anything, even gratuitously, for another, some degree of care and skill in the performance of what he has undertaken. * * * Mere negligence where there is no obligation to use care, as where a man digs a pit upon his own land, and leaves it open, affords no ground of action, but where there is anything in the circumstances to create a duty to the individual or to the public, any neglect to perform that duty from which injury arises is actionable." *Id. 52, 53*. In that case Schuyler was the president of the company, and a director. In 1847 he was appointed transferee agent at New York, subject only to the by-laws. The board handed over to Schuyler all the power the directors themselves possessed. For more than seven years they left to him the unchecked and unquestioned management of the enormous business of this transfer office. The frauds commenced in 1848, and were carried on until 1854. In some manner the excessive and fraudulent issues were all made good in October, in the year 1853. From that date excessive transfers again appear. From 1848 to 1854 all these frauds were written down in the books of the company. A proper examination of the books would have shown, at any time, the over-issue of certificates. It did not appear that any other director than Schuyler had personal knowledge of his personal acts. "But it was also found that the directors were guilty of negligence in not making

Wilkinson *v.* Dodd.

any examination of the books, or of the conduct of the transfer office." *Id. 59.* The court adds : " It is apparent that the use of ordinary care and diligence at any time after March, 1848, would have disclosed that Schuyler's management was fraudulent, both as to the company and the public, and likely to lead to the disasters that have followed upon it. It is a mistake to suppose that his frauds commenced in December, 1853. They were equally gross in turpitude, though not in amount, for a period of five years before that date ; and nothing but the ability of the company to increase the capital from two and a half to three millions has prevented all excesses beyond the first-named sum from falling under the same ban of utter spuriousness. The arrangement by virtue of which the transfer made on false certificates before the increase of the capital became genuine stock, may have been made in ignorance, but it was an ignorance based on negligence so gross that the fact becomes as potent as though the truth had been known. It may have been in ignorance that the company received the benefit of large sums raised by Schuyler indiscriminately on genuine and spurious certificates. Charity may grant that, but equity cannot disregard the fact, for it was a duty to be wise. It is transparent, throughout the case, that the board of directors, by passive submission or active surrender, handed over to Schuyler the substance of all their authority relating to the business in New York, and then, for nearly seven years, laid down to sleep at his feet. Aroused by the shock of the calamity which their folly has induced, are they now to look calmly over the wreck, with no answer to its innocent victims but that of Macbeth to the ghost of Banquo? ' If the managers faithfully perform their duty,' said Strong, J., in *Beers* v. *Phœnix Glass Co., 14 Barb. 360,* ' they exercise constant and vigilant supervision over the acts of their officers, and where such acts are unauthorized, or in opposition to their will, they should, and probably do direct their discontinuance, and, in case of willful and palpable violation of duty, dismiss the agent. If the directors of a company, no matter through inattention or otherwise, suffer its subordinate officers to pursue a particular line of conduct for a considerable period, without objection, they are as

much bound to those who are not aware of any want of authority as if the requisite power had been directly conferred.' I can not file my mind to the belief that equity attaches no consequences to such negligence upon the idea that it is not sufficiently proximate as a cause of the injury. * * * A wrong which ordinary care will prevent is, in a legal sense, caused by the omission of that care where it is a duty to use it. At any stage, a discovery of Schuyler's past frauds would have arrested his career of crime. * * * An examination was a duty, because it was the obvious dictate of good sense as the easiest and safest check upon the agent's conduct. The long-continued and reckless omission was therefore a culpable negligence, without the concurrence of which Schuyler could not have committed the frauds by which the defendants have suffered." *Id. 57, 58, 59.*

Although no questions arose as to the pleadings, I state the facts and the views of judges of great learning and experience, to show that they regarded acts of negligence during many years prior to the one complained of, not only as relevant to the main issue, but as most important. And, being relevant, and so important, the allegations of such facts cannot possibly be in conflict with the rules above laid down. See *Cutting* v. *Marlor, 78 N. Y. 454–458; Bruff* v. *Mall, 36 N. Y. 200; National Bank* v. *Graham, 100 U. S. 699,* and cases cited.

Besides the instances so striking, just given, there are many other illustrations of like methods in establishing charges against defendants. In *New York Mutual Life Insurance Co.* v. *Armstrong, 117 U. S. 591–598,* the court allowed the company to show that Hunter's purpose was to cheat and defraud the company by showing that he had effected insurance upon the life of Armstrong in other companies at or about the same time. "A repetition of the acts of the same character naturally indicates the same purpose in all of them." In this case is cited *Castle* v. *Bullard, 23 How. 172, 186,* where the defendants were charged with having fraudulently sold the goods of the plaintiff, and evidence that they had committed similar fraudulent acts at or about the same time, was allowed, with a view to establish their

Wilkinson *v.* Dodd.

alleged intent with respect to the matters in issue. To the same effect are *Lincoln* v. *Claflin, 7 Wall. 132 ; Cary* v. *Hotailing, 1 Hill 311,* and *Butler* v. *Watkins, 13 Wall. 456–464,* in which case this language is employed : " In actions for fraud large latitude is always given to the admission of evidence. If a motive exists, prompting to a particular line of conduct, and it be shown that in pursuing that line a defendant has deceived and defrauded one person, it may justly be inferred that similar conduct towards another, at or about the same time, and in relation to a like subject, was actua ed by the same spirit." See, also, *Bottomley* v. *United States, 1 Story 135–144; Benham* v. *Cary, 11 Wend. 83 ; Jackson* v. *Timmerman, 12 Id. 299 ; Neff* v. *Landis* (*Pa.*), *3 East. Rep. 162; S. C., 1 Cent. Rep. 133; Blake* v. *Albion Life Assurance Society, L. R.* (*4 C. P. D.*) *94,* and *30 Eng. Rep.* (*Moak*) *417.* I think the argument of the judges in this case deserves special attention. See, also, *Hall* v. *Naylor, 18 N. Y. 588,* and *Allison* v. *Mathieu, 3 Johns. 235.*

But it may be said that none of these cases is analogous to the one under consideration ; true, not precisely in all the facts or circumstances, but that does not impair or destroy the reasoning. The cases cited show that the courts allowed the introduction of evidence of other similar transactions, with other parties, by the defendant, to establish, by a general course of dealing, his mind, intent or purpose ; to establish that in every such transaction before the one in question the defendant intended to perpetrate a fraud or wrong, and thus enable the plaintiff to make his case, or the defendant, as in the Armstrong case, *supra,* to make his defence. The reasoning is that the law is as full of examples of liability of individuals from non-action, silence, inattention or passive submission, as from the most pronounced action. If the former conditions appear, then, in many cases, the law imputes the state of mind, or the intent, with as little hesitation, and with as great certainty as in the latter. If the owner of land sets fire to his own straw or brush, on his own land, and the fire is naturally communicated to his neighbor's buildings, and destroys them, the law holds him who set his own brush on fire as liable for damages as though he had directly set

fire to said buildings.    Again, if the owner of an animal knows that it has a vicious propensity, and has frequently indulged it to the injury of others, the law charges such owner with the intent to commit wrong, and compels him to answer in damages. So, in the case before me, if the allegations of the bill be proved, the law will impute to the defendants an intention to commit a wrong.

Hence, in my judgment, it is in the highest degree proper that the grounds on which the complainant rests his claim should appear in his bill.    In such case, the defendant is entitled to be informed, by the record, of the principle upon which he is charged, and of the facts which bring him within such principle.    I cannot recall any declaration at law or any bill in equity that has ever been deemed sufficient without both of these appearing in them. In most cases the principle upon which the judgment rests arises from the facts as stated.    In *Addison on Torts p. 1147* § *1338*, it is said: " When the declaration is for a breach of duty, the facts creating the duty should be set forth in the declaration.    It is not enough to state that it was the duty of the defendant to do the act which he is stated to have neglected to do."

While it is true that the case of *Williams* v. *McKay, 13 Stew.* *Eq. 189,* was disposed of on demurrer, and not on exceptions, it nevertheless seems to me that every word and line of the opinion of the chief-justice go towards sustaining the bill in the case before me, and consequently to declare that the exceptions are not well taken.    Note the explicit statements and reasoning of the chief-justice : " Nor do I find anything in the charter now before us that curtails or limits the responsibility thus defined.    There appears to be neither provision nor expression in this law that indicates a legislative intention to absolve any of these managers from the duties and responsibilities generally inherent in the office filled by them.    The charter required the defendants to meet at least twice a year as a board of managers, and such regulation was almost entirely useless, unless on such occasions it was their duty to supervise the conduct of their committees, and to look generally into the affairs of the company.    There is no ground for the belief that it was the intention of the legislature

that none but such managers as acted on committees should have the charge of the affairs of the bank. The only guarantee given to depositors consisted in the reputation of its managers, with respect to probity and fiscal ability, and such guarantee was a mere snare if more than two-thirds of such officers were to have no substantial part in the management."

Nor did the court of errors and appeals in this case consider that the inquiry was limited to the transactions which resulted in loss, but went so far as to brush away the statute of limitations in order that the inquiry might be extended over the widest field.

I therefore conclude that none of the exceptions is well taken. There may be a redundancy of expression, of words or phrases, or parts of sentences, within the portions of the bill excepted to, but the exceptions cover other matters pertinent to the issue, and therefore the whole must stand, since in such case all the ground covered by the exceptions must stand or fall together. Finding, as I do, that none of the exceptions is well taken for impertinence, I am not required to consider whether any of the same exceptions are well taken on the ground of scandal.

I will advise that the exceptions be overruled, with costs.