ESTATE of Harry E. DRAPER,
Deceased, et al., Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

ESTATE of Elizabeth C. DRAPER,
Deceased, et al., Appellees,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellant.

Nos. 75–1409, 75–1410.

United States Court of Appeals,
First Circuit.

Argued Jan. 6, 1976.

Decided June 14, 1976.

Evan Y. Semerjian, Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on brief, for appellants.

Michael J. Roach, Atty., Tax Div., Dept. of Justice, Washington, D. C., with whom Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, and William S. Estabrook, III, Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

On June 15, 1969, Harry E. Draper feloniously shot and killed his wife, Elizabeth C. Draper, and then shot himself, resulting in his own death on July 10, 1969. At the time of Elizabeth's death, Harry was the owner and named beneficiary of two insurance policies on her life. Because "[i]t would be contrary to public policy to permit a beneficiary who has feloniously taken the life of the insured to recover on the policy", *Slocum v. Metropolitan Life Insurance Co.*, 245 Mass. 565, 567, 139 N.E. 816, 816 (1923); see *New York Mutual Life Insurance Co. v. Armstrong*, 117 U.S. 591, 600, 6 S.Ct. 877, 29 L.Ed. 997 (1886), the Probate Court held Harry to be estopped from receiving the proceeds, awarding them instead to the Drapers' three daughters. We are asked to adjudge whether this tragedy and the subsequent disposition, generated a tax liability in the estate of either Harry or Elizabeth, or no tax liability at all.[1]

The facts are stipulated and somewhat sparse. On February 24, 1955, Harry purchased the policies, each in the face amount of $50,000, from the John Hancock Mutual Life Insurance Company. He designated himself beneficiary, paid all premiums, and retained all incidents of ownership. Printed clauses in both policies providing for payment to the "executors or the administrators of the Insured" if no beneficiary were living at the insured's death were struck out and replaced with language requiring payment in such case to "Owner and Holder". At Elizabeth's death, these policies had a total net face value of $78,345.68.

Harry's will, after bequests of tangible personal property to his wife and children, provided for the residue to be paid into the "Harry E. Draper Insurance Trust", the terms of which are not in evidence. Elizabeth's will, after provisions for her personal effects to her daughters and for her remaining tangible personal property to Harry, created for the residue a trust under which Harry would receive the net income during his life; on his death the fund would be divided among her daughters, each daughter receiving income until age 30, at which time she would inherit her share of the principal.

In June, 1972, the executors of Harry's estate filed a petition in the Essex County, Massachusetts, Probate Court seeking a decree declaring to whom and in what amounts the proceeds of the policies were payable. The insurer had refused to turn over the proceeds to Harry's estate absent

1. Three-card monte: "A . . . game in which the dealer shows three cards . . . throws them face down on the table, and invites persons to . . . identify the location of a particular card." Webster's 3d Int'l Dict. (unabridged, 1961).

general releases from all parties in interest, but it answered this Probate petition "by way of interpleader", stating that while "it admits liability for the proceeds", it was unable to ascertain how to distribute them properly under Massachusetts law; and that "this respondent is merely a stakeholder in these proceedings, and is willing to pay into Court the said proceeds . . ." John Hancock was allowed to turn the money over to the court.

In a terse decree without opinion, the Probate Court decided, in January, 1973, that "as a result of his having feloniously taken the life of Elizabeth C. Draper, Harry E. Draper and his estate are estopped from receiving the proceeds . . . ; that the Estate of the late Elizabeth C. Draper has no interest in the aforesaid insurance proceeds, she merely being the insured and not the owner of said policies . . . ." The court then decreed, "in the exercise of its equity powers", that the proceeds would be distributed one-third to the deceased's eldest daughter, who was over 30 years old; and one-third each to the two younger daughters, except that they would enjoy only the income from their shares until they reached 30. Further provisions governing what should happen in the event either of the younger daughters died before reaching 30 tracked the terms of Elizabeth C. Draper's will.

In May, 1973, the Commissioner issued deficiency notices, taxing both estates for the full value of the insurance proceeds; in April 1975, the Tax Court found that the proceeds should be included in Harry's estate, but not in Elizabeth's.

We first examine the appropriateness of taxing Harry's estate. The law of Massachusetts, embodied in the *Slocum* case (and following venerable United States Supreme Court precedent), establishes that Harry could not have the money. The Massachu-

setts Probate Court decreed that the money, instead, would go to the daughters. The parties agree that Harry's estate did not in fact dispose of the money, and whatever claim the daughters had could not arise through Harry. How, then, could tax liability be said to exist in Harry's estate?

■ The Tax Court reasoned that although Harry was estopped from receiving the proceeds, he always remained "owner and holder" of the policy, and the value of the policy was the value of the proceeds. We believe that this is unrealistic. The estate tax is imposed upon "the transfer of the taxable estate", 26 U.S.C. § 2001. Nothing of value (with respect to the insurance in question) was transferred upon Harry's death. The policies were of no value to Harry or anyone inheriting from him, because the operation of the *Slocum* principle estopped him and his heirs from receiving the proceeds. Nor did a transfer of the proceeds take place by reason of Harry's death; their disposition would not have been altered had Harry remained alive.[2]

The Probate Court found Elizabeth had "no interest" in the policies. Elizabeth's estate asks us to infer from this statement that the Probate Court's award of the proceeds to the daughters, "in the exercise of its equity powers", generated no tax in her estate either. While this is an attractive approach with considerable surface plausibility, we do not believe that the question is so simple. There remain to be investigated the underlying rights and liabilities of the various parties involved. This is a question of Massachusetts law.

It is simple enough for equity to pronounce that the perpetrator of a wrongful act should not derive profit thereby; but the estoppel of the wrongdoer does not eliminate the problem of deciding who shall

---

2. There remains a conceptual argument, which can be outlined as follows. If the insurance company payment was under the contracts which ran to Harry, he or his estate had a part to play, as constructive trustee in the ultimate transfer. Since Harry was no longer alive when the transfer was made, Harry's estate must have been the conduit as trustee and was therefore taxable. We shall deal with this argument after first considering the underlying question whether the insurer was liable to anyone. *See* footnote 4 and accompanying text, *infra*.

benefit from his wrongful act. The felonious slaying here could have generated a number of different claimants. Analytically, the first question is whether the insurance company might not receive the benefit, through being absolved of liability on the contract. Although John Hancock chose to pay out the amount of the policy, the issue will be considered, as it has important bearing on the ultimate resolution of the case.

■ The general rule is that the insurer remains liable. The American Law Institute Restatement of the Law of Restitution, § 189(1), states it as follows:

> "If the beneficiary of a life insurance policy murders the insured, he holds his interest under the policy upon a constructive trust for the estate of the insured."

But it appears that this formulation may be based upon the assumption that the insured has some legal interest in the contract. Thus in *Slocum* the insured had retained an interest in the policy, and the court held the estate's administrators could still sue despite an 1894 Massachusetts statute giving the beneficiary a cause of action. *See also Cleaver v. Mutual Reserve Fund Life Ass'n*, [1892] 1 Q.B. 147 (Court of Appeal 1891). It will be apparent that these decisions do not expressly settle the situation where the contracting party is the one to whom receipt of the proceeds is barred by equity. No Massachusetts decisions addressing this precise question appear to exist, but the legal commentary we have discovered on the subject is of the unanimous view that in such a case there would be no liability on the insurer. Ames, *Lectures on Legal History* 320 (1913); Wade, *Acquisition of Property by Wilfully Killing Another—A Statutory Solution*, 49 Harv.L.Rev. 715, 741, 748 (1936); Grossman, *Liability and Rights of the Insurer When the Death of the Insured is Caused by the Beneficiary or by an Assignee*, 10 B.U.L.Rev. 281 (1930); Anno., 7 A.L.R. 828 (1920); *see also* Anno., 27 A.L. R.3d 794 (1969).

Thus the ALI, in Comment (e)(3), would recognize the following exception to liability on the part of the insurer:

> "Where no one except the beneficiary or one claiming through him has any interest in the policy, and the beneficiary murders the insured, the insurer is under no liability on the policy. If the policy is taken out by the beneficiary, and the beneficiary at the time when he takes out the policy does not intend to murder the insured, but he later murders the insured, the insurer is under no liability upon the policy. In such a case it is against public policy to permit the beneficiary to profit by the murder, but there is no reason why the estate of the insured should be entitled to the proceeds . . . ."

We find this asserted principle troubling, at least with respect to this case. Contrary to the Comment's assertion, there is significant reason, at least under contemporary standards, why the insured here should receive the proceeds. As wife, mother and homemaker, she contributed in a very real sense to making payments on those policies possible, in the course of a marriage of close to thirty years, during which she raised three children.

Professor Scott, whose treatise (Trusts, 3d ed. 1967) parallels the Restatement, states that the exception to insurer liability applies where "the beneficiary takes out the policy and pays the premiums." § 494.2, at 3531. The exception cannot be based, however, upon the absence of the right to control the distribution of the proceeds, for Scott would apply the general rule of liability even if the insured (being the owner) had not reserved the power to change the beneficiary of the policy. § 494.1, at 3527. Thus the primary, if not the sole differentiating feature is who paid the premiums. In the context of the present case, at least, this appears to us an artificial distinction. The family economic unit is normally composed of both parents. If it is more often the husband who actually earns the salary, the wife participates by taking responsibilities at home, freeing the husband's time for his job. Indeed, the fact that there clearly is an "insurable interest" in the wife reflects this relationship. If both parents work, the availability of money for the pre-

miums—even if only one signs the check—reflects the income of both. Or perhaps one parent may have independent resources. Further, the taking out of insurance presumably reflects a joint decision to divert money that otherwise might have been used by the parents themselves.

In the present case, money was paid to the insurer over a period of fourteen years. Moreover, the apparent purpose of the insurance was ultimately to provide for the children. They were the likely objects of Harry's insurance trust into which the proceeds would have gone had both mother and father died natural deaths. They were also clearly appropriate as recipients under the circumstances as they occurred. There seems to be no sense in saying that they should receive nothing because their father took their mother's life.

■ The equitable balance might well be different absent the existence of a closely interdependent, reciprocally supportive relationship between the owner-beneficiary and the insured, or, possibly, meaningful heirs for ultimate distribution. If no constructive trust were appropriate, liability would indeed be erased.[3]

■ But in this case we do not believe that Massachusetts law would tolerate a denial of liability. We agree with the Tax Court that *Slocum* stands for the broad general proposition that the insurer should normally remain liable. 245 Mass. at page 568, 139 N.E. at 817. The Supreme Judicial Court quotes with apparent approval the following extract from Lord Esher in *Cleaver*:

> "That the person who commits murder, or any person claiming under him or her, should be allowed to benefit by his or her criminal act, would no doubt be contrary

to public policy. But this doctrine ought not to be stretched beyond what is necessary for the protection of the public; and if the matter can be dealt with so that such person should not be benefited, I do not see any reason why the [insurers] in such a case should be allowed to say, though they might have received premiums perhaps for thirty years and still retained the same, that public policy forbade their paying the sum of money which they had contracted to pay."

We believe that the Supreme Judicial Court, seeing no persuasive reason to alter this rule, would apply it to the Draper contract. We therefore think that John Hancock's tendering of the policy proceeds into court was neither charity nor public relations, but performance of a legal obligation.

■ To whom did the insurer owe the obligation? Technically, it was to Harry, as the contracting party. But it follows from *Slocum* that, in the words of the Restatement, § 189(1), "he holds his interests under the policy upon a constructive trust for the estate of the insured". This is merely the law's way of saying that under the circumstances equity treats the contract as for the benefit of the insured's estate and not for the wrongdoer. The "trustee" exists only to make the new obligation fit within the legal construct adopted to accomplish the purpose. At Elizabeth's death all rights and duties were irrevocably fixed. Nothing of legal significance happened thereafter. *Slocum* required the proceeds to be distributed only to those claiming through Elizabeth.[4]

While our analysis is engrafted upon the event, we look upon it as being consistent

---

3. As it could be if there were a clause in the policy absolving the insurer of liability if the beneficiary feloniously kills the insured, *see* Restatement, Restitution § 189(1), Comment (e)(1). And, of course, a contract would be void *ab initio* if the beneficiary intended his felonious act at the time he procured the policy, as was argued, for example, with respect to the assignee in *Armstrong, supra*.

4. Thus, the proceeds did not, in any meaningful sense, even pass through the hands of Harry's executors, *see* footnote 2, *supra*. Even if they were considered to have at some point become a part of his gross estate, however, they would not be subject to tax, for the constructive trust imposed upon Harry by *Slocum* would constitute a "claim against the estate" deducted prior to assessing tax by virtue of 26 U.S.C. § 2053(a)(3).

with the Probate Court's disposition.[5] We agree with that court's analysis that Elizabeth, being the insured and not the owner, had no legal interest in the policies, it following that her estate had no such interest in the proceeds. This disclaimer and the disposition actually made fit comfortably with our conclusion that upon Elizabeth's death state law accorded to her the equitable right to dictate the distribution of the policy proceeds.

In one sense it was the state court itself which dictated the distribution, and the Probate Court decree can be read as claiming the power to distribute outside the terms of Elizabeth's will. It may well be that Elizabeth's lack of legal interest during her lifetime freed the court to look beyond the will. But while the Probate Court may have, "in the exercise of its equity powers", wide discretion, it must be that this action is reviewable; and the limits to the Probate Court's power, it seems to us, must be set by Elizabeth's reconstructed intent. If this is so, the focal nature of Elizabeth's estate is inescapable, and whatever the criteria under which state law rationalizes the result, the disposition retains the hallmarks of a testamentary disposition or a transfer pursuant to the laws of intestate succession. In each, public policy requires that someone, because of a relationship with the deceased, take part of the property. Here, the distribution did not vary from the will, but even if it had, the insured would have remained the linchpin. Since it is the relationship to the deceased which guides the transfer, it should be a taxable event for federal estate tax purposes. The distribution of the proceeds in accordance with Elizabeth's will, as if Harry had predeceased her, amounted to a constructive receipt by her administrators. This right brought the money into the gross estate for federal tax purposes under § 2042(1), which covers "the amount receivable by the executor as insurance under policies on the life of the decedent".

■ The fact that the Probate Court did not include the proceeds in Elizabeth's probate estate does not alter this analysis. It is axiomatic that federal law determines which state-created rights and interests are to be taxed, *Morgan v. Commissioner*, 309 U.S. 78, 80–81, 60 S.Ct. 424, 84 L.Ed. 585 (1940), and it is not uncommon for the federal gross estate to include items outside the probate estate. Here, although the proceeds physically bypassed Elizabeth's probate estate,[6] the underlying Massachusetts law which controlled their allocation dictated that it was through her equitable claim that the daughters took. Elizabeth's estate is accordingly liable for the estate tax.

It is tempting to treat the proceeds as awarded independently to the daughters, thus avoiding an estate tax;[7] they have, after all, already suffered considerably from this tragedy. However, we are convinced that a ruling that the proceeds did not benefit Elizabeth's estate would be tantamount to a ruling that the insurer here was under no liability to produce them in the first place. Such a ruling, under the circumstances of cases like this, would be contrary to Massachusetts law, at least as we read the *Slocum* case,[8] and would not serve sound policy.

*Reversed.*

---

5. The terms of the Probate Court decree closely paralleled Elizabeth's will as if Harry had predeceased her. This follows from *Slocum* which ruled, 245 Mass. at 570, 139 N.E. 816, that the felon there could not inherit under the statute of descent and distribution. Although it could be argued that there is a distinction between a testate and an intestate situation, evidently the *Slocum* court did not think so, for it cited principally, *Riggs v. Palmer*, 115 N.Y. 506 (1889), a case involving a will.

6. Indeed, the record does not reveal that Elizabeth's administrators even asserted a claim by responding to the Probate Court petition.

7. However, we note that absolution of both parents from estate tax liability would have raised the serious possibility that the receipt of the proceeds by the children would be taxed to them as income, *see* the Tax Court opinion at footnote 3, surely an anomalous result.

8. To the extent that the Probate Court decree can be read to the contrary, we respectfully believe that it would contravene *Slocum*. Al-

**950**

LEVIN H. CAMPBELL, Circuit Judge (concurring).

In holding Elizabeth's estate liable for federal estate taxes, the court decides on the authority of *Slocum v. Metropolitan Life Insurance Co.*, 245 Mass. 565, 139 N.E. 816 (1923), that Massachusetts law would not tolerate a denial of liability by the insurer. It seems to me that the present facts are quite different from *Slocum*, and while the Supreme Judicial Court might extend *Slocum* as the court suggests, it might equally adopt the view of the commentators cited by the court that an insurer is in no event liable to one who is neither an owner nor a beneficiary of a life insurance policy. I prefer to leave the development of the law in this area to the state courts.

I accept the court's result here, however, because in the state proceedings the insurer, the representatives of both estates, and the Probate Court evidently took for granted that the insurer was liable. In the absence of any case law to the contrary, it seems fair to adopt this assumption of liability. And once we assume the insurer was liable, I agree that it must be liable to the estate of the insured (viewed as if the murderer had died first) and that the estate is therefore taxable. The only alternative would be to turn the Probate Court into a kind of charitable foundation, with discretion vested in the judge to determine the most deserving beneficiaries, an approach that Massachusetts would be most unlikely to approve.

A point that may have been overlooked is the likelihood that the policy's paid-up value when Elizabeth died would not be held upon a constructive trust but would continue to belong to Harry despite his crime, falling into his estate at his death a month later. As policy owner, Harry presumably could have converted the policy into a certain sum at any time without killing the beneficiary. I do not read *Slocum* to deprive him of that much of the value of the policy because of his wife's murder, since that much of the

value was not generated by the crime. It should follow that the cash value of the policy is taxable to the husband's estate and only the remainder to the wife's. Apparently, however, the Government never pursued this theory—perhaps for some good reason—and at this stage, given the posture of all parties, I concur in the court's disposition.

---

though we would give it "proper regard", it would not be binding where we believed the highest court in the Commonwealth would rule

differently. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).