ELLIOTT v. THE DES MOINES LIFE ASSOCIATION, Appellant.

### Division Two, May 21, 1901.

1. **Life Insurance:** INSURANCE IN OTHER COMPANIES: DEED TO FARM: FRAUD: EVIDENCE. Previous to the issuing of the $5,000 policy of life insurance in suit, the assured was carrying $12,000 of insurance in other companies, and shortly after taking out the policy sued on, she made application to various companies for $21,000 more of insurance. The evidence showed that a farm, valued at $4,500, which was incumbered to the extent of $2,600, constituted practically all the property owned by the assured from which she could raise the premiums on so large an amount of insurance. The defense to a suit on the $5,000 policy was, that the assured had obtained it with a determination, at the time, to commit suicide, and thus defraud the company. *Held*, that, since the issue tendered was that of fraud in the procurement of the policy, it was error to exclude from the jury letters addressed by the assured to the agents of various insurance companies, urging them to call on her and take her applications for large amounts of insurance; *and*, that it was error to ex-

Elliott v. Des Moines Life Ins. Co.

clude from the jury a deed, made by the assured by which she conveyed her aforesaid farm to her mother, the plaintiff, a few days before her death.

2. ———: ASSESSMENT COMPANY: MISREPRESENTATIONS. Insurance companies, organized and doing business under the insurance act of 1887 (article 3, chapter 89, Revised Statutes 1889), on the assessment plan, are exempt from the operation of section 5849, Revised Statutes 1889, which provides that no misrepresentation made in obtaining a life insurance policy shall render it void, unless the misrepresentation actually contributed to the event on which the policy became due, and that whether it so contributed shall be a question for the jury.

3. ———: ———: ASSESSMENT POLICY: ADDITIONAL PREMIUM: SAFETY CLAUSE. The policy issued by the defendant company provided for certain fixed payments to be made by the assured, but contained a "safety clause" which provided that, "in case the death rate ever exceeds our estimated rates, the association will pay the deficiency from the emergency or reserve fund until such fund is exhausted, after which an additional premium may be levied pro rata, by the executive board, to meet such deficiency." *Held*, that such policy is an assessment policy within the meaning of section 5860, Revised Statutes 1889, which provides that, if "the payment of the benefit is in any manner or degree dependent upon the collection of an assessment upon all persons holding similar contracts, it shall be deemed a contract of insurance on the assessment plan."

4. ———: ———: SUICIDE CLAUSE IN POLICY: INSTRUCTION. An insurance company on the assessment plan is not required to show as a defense that the insured contemplated suicide at the time of the application for the policy. The policy in this case contained a provision that "if the insured within the period of three years from (its) date die by her own hand, whether sane or insane, this policy shall be null and void except as to payments made thereon with interest." *Held*, a valid and binding agreement, and suicide within three years from the date of the policy a complete defense to the action. *Held*, further, that it was error to refuse to instruct the jury that if they should believe from the evidence that the deceased, within three years from the date of the policy sued upon, caused her own death, with suicidal intent, their verdict should be for the defendant.

5. ———: APPLICATION: FALSE ANSWER: INSTRUCTION. The court refused to instruct the jury that if they should believe that the as-

sured, in her written application for the policy sued on, in answer to
the question, "Do you now use or have you ever used opium, chloral,
cocaine or any other narcotic drug?" answered "No," and if they
should further believe that said answer was knowingly false and un-
true, their verdict should be for the defendant. *Held*, error.

Appeal from Chariton Circuit Court.—*Hon. W. W. Rucker,*
Judge.

REVERSED AND REMANDED (*with directions*).

*Geo. R. Sanderson, A. H. Evans* and *Stockwell & Lamb*
for appellant.

(1)    The letters written by Coda M. Elliott to Reuben
Winfree, offered in evidence, were competent and material tes-
timony under the issues raised by the pleadings, as tending to
establish the allegations of a fraudulent purpose in taking out
the policy of insurance sued upon, in contemplation of suicide.
Whitmore v. Supreme Lodge, 100 Mo. 48; Ins. Co. v. Arm-
strong, 117 U. S. 598.    (2)    The proper foundation for the
admission of the copy of the letter written by Coda M. Elliott
to F. H. Wilhite was laid.    The evidence was competent and
material for the same reasons that the letters to Reuben Win-
free were competent and material.    (3)    The deed showing
a conveyance by Coda M. Elliott to her mother, was competent
and material evidence on the question of fraud.    (4)    The
defendant, The Des Moines Life Association, was at the date
of the application for, and the date of issue of, the policy sued
on, a duly organized assessment insurance association, under
the laws of the State of Iowa, and had authority to issue policies
of insurance on the assessment plan in the State of Missouri
on said dates.    American Ins. Co. v. Smith, 19 Mo. App.
627; Hanford v. Life Assn., 122 Mo. 50; Haydel v. Life

Assn., 104 Fed. Rep. 718. (5) Policy No. 17080, issued by the defendant company to Coda M. Elliott on December 30, 1895, and filed as the basis of this action, is an assessment policy and defendant is entitled, in a construction of said policy and in determining its liability thereunder, to all the exemptions and provisions of the laws of this State as they existed on said December 30, 1895. Hanford v. Life Assn., 122 Mo. 50; Thassler v. Life Assn., 67 Mo. App. 505; Toomey v. Supreme Lodge, 147 Mo. 129; Haydel v. Ins. Co., supra. (6) The general provisions of the insurance law of this State do not apply to the policy in suit. Said policy is unaffected by any provision of the statutes of this State except as they appear in article 3 of chapter 89 of the Revised Statutes of Missouri of 1889. Hanford v. Life Assn., 122 Mo. 50; Sparks v. Life Indemnity Co., 61 Mo. App. 109; Richards v. Ins. Co., 68 Mo. App. 585. (7) The suicide of Coda M. Elliott rendered said policy null and void except as to payments made thereon with interest. Sparks v. Life Indemnity Co., 61 Mo. App. 109; Adkins v. Life Ins. Co., 70 Mo. 27, and cases cited; Wallace v. Life Assn., 80 Mo. App. 102; Hayne, Gdn., v. Indemnity Co., 139 Mo. 417. (8) The false and fraudulent statements of Coda M. Elliott in her application for the policy in suit, as to the amount of insurance then on her life, were by her warranted to be true and offered as the basis and consideration for the issuance of said policy. Said statements vitiate and avoid said policy. Whitmore v. Supreme Lodge, 100 Mo. 37; Hanford v. Life Assn., 122 Mo. 50; Linn v. Life Ins. Co., 8 Mo. App. 371; Aufderheide v. Life Assn., 66 Mo. App. 285; Allen v. Life Assn., 147 Mo. 561.

*Kinley & Kinley, Charles C. Hammond* and *A. W. Johnson* for respondent.

(1)    The answer in this case nowhere alleges that the policy or contract of insurance sued on was in any manner or degree dependent on the collection of an assessment upon persons holding similar contracts, and hence such policy could only be regarded and treated by the court below under the pleadings as it was averred to be by the plaintiff, an old line or level premium policy.   The allegation that defendant was an assessment insurance company was not alone sufficient, for the contract made between the company and the insured controls, and its terms or effect should have been pleaded if defendant wished to prevent recovery, because the policy was, as usually termed, an assessment policy.   Muldrow v. Caldwell, 7 Mo. 563; Moore v. Platte Co., 8 Mo. 467; Bateson v. Clark, 37 Mo. 31; Jones v. Loudeman, 39 Mo. 287; Pier v. Heinrichoffen, 52 Mo. 333; Russell v. Whitely, 59 Mo. 196; Scott v. Cobards, 67 Mo. 289; Cook v. Putman Co., 70 Mo. 668; Nuster v. Adler, 86 Mo. 455; Young v. Scofield, 132 Mo. 650; Boles v. Benington, 136 Mo. 522; Merrill v. Trust Co., 46 Mo. App. 236; McConey v. Wallace, 22 Mo. App. 377. Defendant's instructions refused were outside of the issues made by the pleadings and were properly refused.   Wright v. Fonda, 44 Mo. App. 642, and cases cited; Nugent v. Curran, 77 Mo. 323.   (2)   The letter from Coda M. Elliott to Reuben Winfree was properly excluded by the court for the reasons:   first, that it was immaterial and did not tend to establish any of the defenses stated in defendant's answer; second, the applications for insurance which said letter requested and referred to were introduced and read in evidence.   (a)   The deed of date February 24, 1896, by Coda M. Elliott to plaintiff was properly excluded from the jury because it was immaterial and in nowise tended to sustain any of the issues in the case.   (b)   The letter to Wilhite was properly excluded for the same reason, it in nowise tending to sustain any of the

issues in the case, and for the further reason that the admissions or statements of the assured, after taking the policy, can not be used to defeat a recovery thereon. Reid v. Ins. Co., 58 Mo. 421; Rawls v. Mutual Life, 27 N. Y. 282; Life Ins. Co. v. Harvey, 10 Kan. 525; Ins. Co. v. Cheever, 36 Ohio St. 208; Goodwin v. Provident Life Co., 97 Iowa, 226, 66 N. W. 160; 2 May Ins. sec. 579 A; Bliss Ins. sec. 383. (3) The charge made in the answer that Coda M. Elliott at the time of making the application for the policy sued on, premeditated and contemplated suicide was fairly submitted to the jury under the evidence, and instructions 2 and 4 given on behalf of plaintiff by the court below, and the finding of the jury thereon is conclusive on this question. (4) The policy sued on is a level premium contract—so much insurance for so much money; that is $5,000 for $18.50 payable quarterly, and $10 per year for five years to the guaranty fund. The policy sued on nowhere provides or discloses that the payment of the benefit to accrue to plaintiff upon the death of Coda M. Elliott is in any manner or degree dependent upon the collection of an assessment upon persons holding similar contracts. Nothing shows that any other persons hold similar contracts, or that the $5,000 due plaintiff was to be paid in whole or part out of a fund raised by assessment upon other persons holding similar contracts by which they are made liable for the payment of such assessments. Jacobs v. Omaha Life Assn., 146 Mo. 523; Toomey v. Supreme Lodge, 147 Mo. 129; Logan v. Casualty Co., 146 Mo. 114; Aloe v. Fidelity Co., 55 S. W. 998; Jacobs v. Ins. Co., 142 Mo. 49. (5) The answer to the question "In what companies is your life now insured?" was correctly answered. The question was not how much insurance have you on your life, but in what companies. The answer being correct to the question stated, the mere volunteering any statement not inquired for can not be claimed to affect

defendant's liability. All construction in these applications prepared by the company for the applicant to answer are to be construed against the company and in favor of the person claiming under the policy. Hoffman v. Ins. Co., 56 Mo. App. 301; Burnett v. Ins. Co., 68 Mo. App. 343; Ins. Co. v. Roddie, 120 U. S. 184; Hotchkiss v. Ins. Co., 26 N. Y. 69; Hoffman & Place v. Ins. Co., 32 N. Y. 405; Ins. Co. v. Eddie, 49 Ill. 106. (6) The fifth instruction asked by defendant was properly refused because it discussed the evidence and assumed facts that were within the province of the jury in the following language, to-wit: "The said application was fraudulent and the policy of insurance issued thereon is null and void." It is defective because it ignores the issue as to whether the insured committed suicide and if she did not commit suicide, then contemplating it at the time of making application for the policy would not avoid the policy. Spillane v. Railroad, 111 Mo. 563.

GANTT, J.—This is an action on a life insurance policy issued by the defendant association on the life of Coda M. Elliott for the benefit of her mother, the plaintiff, and numbered 17080. The suit was commenced December 5, 1896, in the circuit court of Chariton county. The policy was issued December 30, 1895.

Plaintiff in her petition alleged that she was the mother of Coda M. Elliott and the beneficiary named in said policy No. 17080; that said policy was issued to Coda M. Elliott by the defendant company in consideration of a quarterly payment of $18.50 and the execution of a guaranty note in sum of $50 in said petition set out; the due performance of all the conditions of said contract on the part of Coda M. Elliott and Hettie V. Elliott, the plaintiff herein; the death of Coda M. Elliott on the second day of March, 1896; that the plaintiff

furnished defendant with proofs of the death of Coda M. Elliott on the twenty-sixth day of March, 1896, and that the same were accepted and received by the defendant. Plaintiff's prayer was for $5,000, the amount of the policy and interest at six per cent per annum from June 26, 1896.

The defendant, answering, denied the principal allegations of plaintiff's petition and set up as an affirmative defense that it was an assessment company; that it had complied with all the provisions of article 3, chapter 89, of the Revised Statutes of Missouri for the year 1889, and was authorized under and by virtue of said article 3, chapter 89, to do the business of life insurance on the assessment plan in the State of Missouri at the date of the application and the issue of the policy in suit and held a certificate of authority, authorizing it to do such business, from the insurance department of the State of Missouri; that said policy No. 17080 was an assessment policy and provided that if a member, within three years from the date thereof, should die by his own hands, whether sane or insane, said policy should be void except as to payments made thereon with interest; that on or about the first day of March, 1896, Cody M. Elliott did die by her own hands by means of opium or morphine poison, by herself administered with suicidal intent; that on the date of the application by Coda M. Elliott for the policy sued on, the said Coda M. Elliott premeditated and contemplated suicide and that said policy was fraudulently applied for with the intent to commit suicide and self-destruction. That in her written application and medical examination Coda M. Elliott stated the insurance then carried by her to be "Monroe City $2,000, National Life $5,000," and that she had never used opium, chloral or other narcotic drug and that she had never suffered from rheumatism; that all of said answers were knowingly false and fraudulent, though warranted by the applicant to be full, complete and true, and were offered to

the defendant as the basis and consideration for the contract of insurance applied for.    Defendant tendered into court the $18.50 paid on the policy with interest; also the guaranty note of $50 and one note for $74 given for the first year's premium on said policy.

The plaintiff replied by special and general denial of all the allegations of defendant's answer and the further allegation that though the misrepresentations were made as alleged in defendant's answer, they were not material and did not contribute to the event upon which said policy would become due and payable, to-wit, the death of Coda M. Elliott.

Upon the issues thus framed as above set out the evidence discloses that at the date of the issuance of the policy sued on Coda M. Elliott was about thirty-five years of age, in good health and a good specimen of physical womanhood; that at that time she lived with her mother on a farm of seventy acres about one-half mile west of Salisbury, Missouri.    At this time Coda M. Elliott, her mother and an elder brother constituted the entire family.    The title to the farm above referred to was in Coda M. Elliott at the date of the issue of the policy sued on.    At that time there was a valid and subsisting incumbrance upon said farm in the sum of $2,600, dated September 5, 1895.    At the date of the trial, July 17, 1897, no part of this incumbrance, principal or interest had been paid. This farm was valued by different parties at about $4,500. From the assessment list of Coda M. Elliott for the year 1895 this farm was assessed at $825.    From said assessment list and the testimony of the plaintiff, Hettie V. Elliott, it appears that the assured had no other real property and but little personal.

On December 27, 1895 (the day prior to the date of application for the policy in suit), Coda M. Elliott wrote W. H. Lewis making a most extraordinary offer for the sale of her

farm, if sold before January 15, 1896. She writes: "I wish a payment of $2,500 down and I will place as a forfeit $700 in any bank you may name, and if I fail to buy the farm back before July 16, 1896, at $1,500 more than you pay for it, then the farm and the $700 are your property;" or "I will give you $150 to make me a loan of $500 by January 15, or a few days thereafter." On December 30, she directed a letter which is almost an exact copy of the letter to Lewis, to Wm. Hammack, of Salisbury. Some time in January, 1896, a letter of like purport was addressed to J. B. Hyde, a banker of Salisbury, Missouri.

At the date of the application, Coda M. Elliott had insurance on her life in the sum of $10,000 in the National Life Insurance Company of Vermont. Five thousand dollars of this was payable to her mother, Hettie V. Elliott, and $5,000 to Wm. Cravens. At this time there was an additional policy on her life for $2,000 in the Safety Fund Life Association which was also payable to her mother, Hettie V. Elliott, the plaintiff. This policy was issued in consideration of a quarterly payment of $7.50. In her application for the policy in suit she states her total insurance to be $5,000 in National Life and $2,000 in the Monroe City company.

On the third day of February, 1896, the assured, under the policy sued on, made application to the Massachusetts Benefit Life Association for insurance in the sum of $10,000. Policies were issued in accordance with said application in the same month, in consideration of the yearly sum of $179. For this premium she gave her note dated February 3, 1896. In her application for these policies she represented her entire insurance to be $5,000 in the National Life, and $2,000 in the Monroe City company and $5,000 in the Des Moines Life Association.

On February 6, 1896, Coda M. Elliott made application

to the United States Life Insurance Company of New York for insurance in the sum of $10,000. In her application for this policy she states her entire insurance to be $10,000 in the National Life of Vermont and that no other negotiations were pending for insurance on her life.

On February 27, and on February 28, Coda M. Elliott made two several applications to the Mutual Reserve Fund Life Association for two policies in the sum of $3,000. In each of these applications she represented her entire insurance to be $2,000 in the Safety Fund Life Association and $5,000 in the Des Moines Life Association. For the premiums on these policies she executed two notes each in the sum of $76.96 dated respectively February 27 and February 28, and due April 1, 1896.

On February 25, 1896, said Coda M. Elliott made application to the Bankers Life Association for a policy in that company in the sum of $5,000. In this application she states her insurance to be $10,000 in the National Life of Vermont.

It further appears from evidence offered, but excluded from the jury upon the objection of the plaintiff, that the applications for the two policies in the Mutual Reserve Fund Life Association were taken by one Reuben Winfree, an agent of said company then residing in Salisbury, Missouri. That said agent went to the residence of said Coda M. Elliott in response to letters from her requesting him to call and take her application for said policies.

It further appeared from evidence offered by the defendant, but excluded upon the objection of the plaintiff, that on February 13, 1896, said assured addressed a letter to F. H. Wilhite, an insurance agent then residing in Salisbury, Missouri, asking him to call at her home and take her application for a policy of $5,000 or more if he could write more on a

lady's life.    These letters appear in full in appellant's abstract of record.

On the twenty-fourth day of February, 1896, said Coda M. Elliott conveyed by warranty deed the farm where she then resided to her mother, the plaintiff herein.    These deeds were offered in evidence by the defendant but were excluded from the jury upon the objection of the plaintiff.

On the night of February 29, or the morning of March 1, 1896, the assured administered to herself an overdose of morphine or other opium poison, which resulted in her death on March 2, 1896.    The evidence of the attending physician, the members of the assured's family, and the letter written and left by the deceased for Miss Nellie Myers, preclude any other theory than that the death of Coda M. Elliott was a willful and deliberate suicide.

From the evidence it appears that the defendant company was organized under chapter 65, Acts of the twenty-first General Assembly of the State of Iowa, entitled "An Act to regulate the organization and operation of Mutual Benefit Associations," and under this act was entitled to do the business of life insurance on the assessment plan in the State of Iowa.

It further appears that the defendant company was authorized and empowered under and by virtue of the provisions of article 3, chapter 89, of the Revised Statutes of Missouri for the year 1889, to do the business of life insurance on the assessment plan in the State of Missouri.    Said company had complied with every provision of said article 3, chapter 89, and had received for the years covering the date of the application for the policy in suit, certificates of authority from the insurance department of the State of Missouri, authorizing it to do the business of life insurance on the assessment plan in the State of Missouri on the dates aforesaid.

The policy in suit and read in evidence by plaintiff dis-

closes the fact that said policy contained *the safety clause, the suicide clause, and all the other clauses, provisions and conditions set out and pleaded in the answer of the defendant.*

Upon motion of plaintiff the court then instructed the jury as follows:

"1.   The court instructs the jury that on plaintiff's petition the following admissions are made by the pleadings herein:

"First.   That the defendant, the Des Moines Life Association, is now and was on February 26, 1896, a corporation under the laws of Iowa authorized to do business in Missouri as an insurance company.

"Second.   That the plaintiff was the mother of Coda M. Elliott.

"Third.   That Coda M. Elliott died on March 2, 1896.

"Fourth.   That plaintiff on the second day of March, 1896, furnished the defendant with due notice and proof of the death of said Coda M. Elliott.   That defendant received and accepted said notice and proof of death.

"Fifth.   That defendant, after the expiration of ninety days from receiving and accepting said notice and proof of death of Coda M. Elliott, refused to pay the amount of said policy sued on, to-wit, $5,000, to the plaintiff.

"Sixth.   That on the thirtieth day of December, 1895, by its policy of insurance No. 17080 the defendant, in consideration of a guaranty note for the sum of $50, dated December 28, 1895, signed by Coda M. Elliott, payable in five equal installments with interest at four per cent per annum, and the further consideration of $18.50 paid by the said Coda M. Elliott for the first quarter and the same sum to be paid quarterly in advance each and every year thereafter during the life of said Coda M. Elliott, did insure the life of said Coda M. Elliott in the sum of $5,000 to be paid to the plaintiff, in case

of the death of said Coda M. Elliott, within ninety days after the acceptance of satisfactory proof of the death of said Coda M. Elliott.

"2. The jury are instructed by the court that if they find from the evidence in this case that the defendant company, on or about December 30, 1895, insured the life of Coda M. Elliott in the sum of $5,000, payable to the plaintiff upon the death of Coda M. Elliott, and that plaintiff was the mother of said Coda M. Elliott, and that said Coda M. Elliott died on or about the second day of March, 1896, and that thereafter the plaintiff furnished defendant with notice and proof of the death of said Coda M. Elliott, and that defendant, ninety days thereafter, refused to pay said amount of said policy to plaintiff, you will find your verdict for the plaintiff in the sum of $5,000, with six per cent interest from July 1, 1896, unless you further find that said Coda M. Elliott contemplated suicide at the time she made application for said policy of insurance or unless you further find that said Coda M. Elliott made misrepresentation concerning the amount of life insurance she had when she made said application, or made misrepresentations as to the use of morphine, and that such misrepresentations or either of them, actually contributed to the death of said Coda M. Elliott.

"3. The jury are instructed by the court that, though said Coda M. Elliott stated in her application that she was not in the habit of using morphine, opium, or other narcotics, yet if you find that when she had her hip dislocated her doctor or doctors administered morphine or other narcotics to aid them in treating said dislocation, and that she used said morphine or other narcotic during said treatment under said directions of her physicians, that is not such a use of morphine or other narcotics as made the answers to said questions untrue, nor

Vol 163 mo—10

would the policy sued on be affected by the use of said morphine or other narcotic under prescriptions or directions as above set out in this instruction.

"4.   Although the jury may believe that Coda M. Elliott committed suicide on or about the first day of March, 1896, yet, unless the evidence shows to the satisfaction of the jury that Coda M. Elliott contemplated suicide when she made application for the policy sued on, such suicide will not be a defense to a recovery on this policy.

"5.   Though the jury may find from the evidence that said Coda M. Elliott in her application for the policy in question made misrepresentations concerning the policies of insurance she had in the National Life Insurance Company of Montpelier, Vermont, yet such misrepresentation, if you find it was made, will not prevent a recovery on the policy sued on, unless you find from the evidence that the matter misrepresented actually contributed to the death of said Coda M. Elliott."

To which instructions given by the court on motion of the plaintiff, the defendant then and there excepted.

Upon its behalf the defendant prayed the court to instruct the jury as follows:

"1.   The court instructs the jury that under the pleadings, admissions and evidence in this case, the plaintiff is not entitled to recover and their verdict must be for the defendant.

"2.   The court instructs the jury that the application made by Coda M. Elliott to the Des Moines Life Association, defendant herein, and the policy issued by said association upon said application, constitutes the contract between the Des Moines Life Association and the said Coda M. Elliott; that the said policy of insurance was issued in consideration of said application and relying upon the truth of the statements made in said application contained, all of which statements were war-

ranted by the said Coda M. Elliott to be full, complete and true. The jury are therefore instructed that if they believe from the evidence that in answer to the question, 'In what companies is your life insured?' the said Coda M. Elliott answered, 'Monroe City $2,000, National Life $5,000' and if you further believe that said answer was false then your verdict must be for the defendant.

"3. The jury are instructed that if you believe from the evidence that Coda M. Elliott, deceased, did within three years from the date of the policy herein sued upon, come to her death by her own hand or act by means of morphine or other opium poison, by herself administered, with suicidal intent, then your verdict must be for the defendant.

"4. The court instructs the jury that if you believe from the evidence that in her written application for the policy sued on in this case, the said Coda M. Elliott in answer to the question, 'Do you now use, or have you ever used opium, chloral, cocaine or any other narcotic drug?' answered 'No,' and if you further believe that said answer was knowingly false and untrue, then your verdict must be for the defendant.

"5. The court instructs the jury that if you believe from the evidence that at the time Coda M. Elliott, deceased, made application for the policy of insurance herein sued on, she, the said Coda M. Elliott, contemplated suicide, the said application was fraudulent and the policy of insurance issued thereon is null and void and your verdict must be for the defendant; and in this connection the court instructs the jury that in determining the question of such contemplated suicide they should take into consideration all the facts and circumstances detailed in evidence."

These several instructions the court refused to give, to which ruling of the court in refusing to give said instructions, the defendant then and there excepted and still excepts.

Whereupon, the cause was submitted to the jury, who re-turned the following verdict:

"We the jury find for the plaintiff in the sum of five thousand three hundred and twelve 50-100 dollars," and the court entered judgment for the amount of said verdict and costs.

In due time defendant filed its motions for new trial and in arrest of judgment, which, having been overruled and exceptions duly saved, it appeals to this court.

Numerous errors are assigned for a reversal of the judgment.

I.    Reuben Winfree was a witness on the trial on behalf of defendant.    He testified he was the agent at Salisbury for the Mutual Reserve Fund of New York, a life insurance company.    In response to a note from Miss Elliott he went to the residence and took her application for a $3,000 policy in said company.    In response to another note, dated February 20, 1896, he went out and took another application for $3,000 more.    Before he sent in this last application he learned Miss Elliott had taken morphine and killed herself.    He identified the two notes he received from her and defendant offered them in evidence.    The plaintiff objected to the letters because no act or statement of the *assured* could affect plaintiff's recovery, and the objection was sustained and defendant excepted, and now assigns their rejection as error.    The witness also testified he had never at any time solicited Miss Elliott to take a policy.    Had in fact never seen her before he went to see her in response to the notes.

The said notes were as follows:

"February 15, 1896.

"Mr. Winfrey:

"Dear Sir:    I understood that you represent a good in-

surance company.    If you insure the lives of ladies you may call at my house one-half mile west of Salisbury and take my application for a life policy.    I am going on a trip to Texas and wish a life policy before I go.

"Miss Coda M. Elliott."

"February 26, 1896.
"Mr. Winfrey, your medical examiner has not come out, if you will come out and bring note and receipt I will have you take my application for an additional $3,000 policy which will make $6,000 in all.

"Come out as soon as you get this note *as I am going away on Saturday*.

"Coda M. Elliott."

We are unable to justify the exclusion of these two notes.

The assured was a party to the contract, from which plaintiff is seeking the benefit.

When the issue tendered is one of fraud, as in this case, it is the acts and statements of the assured by which the fraud is to be shown.    It was the theory of the defense that the assured procured the policy in suit with a determination at the time to commit suicide and thus defraud the company.

To establish this it was perfectly competent to show that the assured had, about the same time, before and after the taking out of this policy, effected other insurance largely disproportioned to her financial ability to carry.

It was so expressly ruled by this court in Whitmore v. Supreme Lodge, 100 Mo. 48, in which a similar ruling by the Supreme Court of the United States was quoted with approval as follows:

"The theory of the defense is that the purpose of Hunter in obtaining the insurance was to cheat and defraud the com-

pany.   In support of that position, evidence that he effected
insurance upon the life of Armstrong in other companies at or
about the same time, for a like fraudulent purpose, was admis-
sible.   A repetition of acts of the same character naturally
indicates the same purpose in all of them; and, if, when taken
together, they can not be reasonably explained without ascribing
a particular motive to the perpetrator, such motive will be con-
sidered as prompting the act."    [N. Y. Mut. Life v. Arm-
strong, 117 U. S. 598.]

These notes were not only competent and pertinent to show
the taking out of other large policies just a day or two before
her suicide, but they tend to show that they were obtained by
her own importunity and not as the result of the persuasion of
the agents who took her application.   We think the court
clearly erred in excluding the two notes.

II.   The copy of the letter written by Miss Elliott to F.
H. Wilhite was also competent for the like reason that the
letters to Winfree were admissible.   The witness had already
accounted for the loss of the original and had testified the
copy was an exact copy of the original.   That letter was as
follows:

"Salisbury, Mo., February 13, 1896.
"Mr. F. H. Wilhite:

"Dear Sir:   Come out on Saturday, February 15, or
Monday, February 17, and take my application for a policy of
life insurance.   I am going to New Mexico to live and wish a
policy in your company before I go.   I will take a policy of
$5,000 and more if your company writes more than $5,000
on ladies' lives.   Some companies do not insure ladies' lives
for more than $5,000.   Come out on Saturday if you can.   I
will leave for New Mexico near March 1, 1896.

"Miss Coda M. Elliott."

In this connection we may also consider the exclusion of the deed of the assured, Miss Elliott, to her mother, the plaintiff, to the farm, the only property, it appears, from which she could raise the premiums on so large an amount of insurance.

That deed was obviously competent on the issue of fraud made by the pleadings, in connection with all the other testimony.

III.   The important question in this case is, whether the defendant company is an assessment insurance company or an old line company, and if an assessment company whether the policy in suit is an assessment policy?   As this is a Missouri contract, its character must be determined by our statute governing the subject.

Article 3, chapter 89, Revised Statutes 1889, the law in force when this contract was made, was originally passed at the session of the General Assembly of Missouri for the year 1887.   [Laws 1887, p. 199.]

The essential elements of an assessment policy, under that act are to be found in sections 5860, 5862 and 5864, Revised Statutes 1889, which are in these words:.

"Section 5860.   Every contract whereby a benefit is to accrue to a person or persons named therein, upon the death or physical disability of a person also named therein, *the payment of which benefit is in any manner or degree dependent upon the collection of an assessment upon all persons holding similar contracts, shall be deemed a contract of insurance on the assessment plan,* and the business involving the issuance of such contracts shall be carried on in this State only by duly organized corporations, which shall be subject to the provisions and requirements of this article. * * *"

Section 5862 provides: "Every policy or certificate hereafter issued by any corporation of this State doing business in conformity with the provisions of this article, and prom-

ising a payment to be made upon the contingency of death, sickness, disability or accident, shall specify the exact sum of money which it promises to pay upon each contingency insured against, and the number of days after satisfactory proof of the happening of such contingency at which such payment shall be made, and upon the occurrence of such contingency, unless the contract shall be avoided for fraud, or breach of its conditions, the corporation shall be obligated to the beneficiary for the payment at the time and to the amount specified in the policy or certificate. * * *"

Section 5864 provides: "Corporations organized or doing the business of life insurance under this article shall provide for the accumulation of an *emergency fund* * * * which fund, together with the interest thereon, shall be a trust fund for the payment of death claims or other benefits provided for in their policies or certificates * * *. If, in any period of six months, the death rate of any such corporations shall be in excess of the annual rate of mortality as shown by the American life tables, it shall be lawful for such corporation to draw out any portion of such securities to meet such excess * * *. In case the amount so drawn out shall reduce such fund below the amount so required to be provided for, it shall be the duty of such corporation to make up the said deficiency within six months thereafter * * *."

These provisions of our insurance laws have been before this court for interpretation in a number of cases. In the leading case of Hanford v. Mass. Ben. Assn., 122 Mo. 50, it was ruled that by express exemption insurance companies organized and doing business under the statute of 1887, on the assessment plan, are not subject to the provision of sections 5849 and 5850, Revised Statutes 1889, which were enacted in 1874 and provide that "no misrepresentation" made in procuring a policy "shall be deemed material, or render the policy

void unless the matter thus represented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether so contributed in any case shall be a question for the jury," and that a defense based upon misrepresentations shall not be valid unless the defendant shall deposit in court for the plaintiff the "premiums received on such policies."

That decision was subsequently approved and followed by the Court in Banc in Aloe v. Fidelity Mut. Life Assn., 55 S. W. Rep. 993.

In that and subsequent cases this court considered what were the essentials of an assessment policy under sections 5860 and 5862, Revised Statutes 1889, because the two must be read and construed together. It was held to be no objection that the insurance company undertook and agreed to pay a fixed amount, for section 5862 expressly requires that every such assessment policy or certificate of membership "shall specify the exact sum of money which it promises to pay upon each contingency insured against," and the number of days in which the benefit will be paid after proof of loss. [Hanford v. Ass'n, 122 Mo. loc. cit. 59.]

But it was also held in Jacobs v. Life Assn., 146 Mo. loc. cit. 538, that, "the primary and controlling principle of the statute is that the benefit is to be paid out of a fund raised by assessment upon other persons holding similar contracts, by which they are made liable for the payment of such assessments. No scheme of life insurance can come within this principle and become insurance upon the assessment plan, unless somewhere along the line of its operations provision is made for such an assessment, and liability for its payment created. The right to have the assessment made must be given to the insured; the duty to make it must be imposed upon the corporation, and liability for its payment upon its members."

It will be observed that neither the statute nor this interpretation of it forbids an estimate in advance of what assessments will be necessary during the life of the certificate or policy to pay the benefit, but the language is "the payment of which said benefit is in any manner or degree dependent upon the collection of an assessment upon persons holding similar contracts." [Section 5860, R. S. 1889.] Neither is it any objection to an assessment plan that it provides for an emergency fund, for section 5864 provides that "corporations organized or doing the business of life insurance under this article shall provide for the accumulation of an emergency fund * * * which fund, together with the interest thereon, shall be a trust fund for the payment of death claims or other benefits provided in their policies or certificates," and "if, in any period of six months, the death rate of any such corporation shall be in excess of the annual rate of mortality as shown by the American life tables, it shall be lawful for such corporation to draw out any portion of such securities to meet such excess." The defendant in this case, at the time of the issuing of the certificate or policy sued on, had a certificate from the insurance department of this State certifying that it had complied with all the requirements of the laws of this State and was authorized to do insurance business in this State on the assessment plan. In the Hanford case, the policy was held to be on the assessment plan by the provision in the policy that the board of directors might call for and require the payment of a different amount by giving special notice and the amount called for might be based upon the current age of the member and the mortality experience of the association, and, "if the mortality experience of the association shall require any variation in said rates in any call, due notice will be given."

In the policy or certificate issued in this case, after requiring certain definite estimated amounts to be paid by the

member or assured, there is the following provision: "SAFETY CLAUSE. In case the death rate ever exceeds our estimated rates, the association will pay the deficiency from the emergency or reserve fund until such fund is exhausted, after which an additional premium may be levied pro rata, by the executive board, to meet such deficiency."

Upon two well-defined contingencies an additional or extra assessment can be levied pro rata upon the members to pay any loss; that is, if the death rate shall exceed the estimated rate of the company, and the emergency or reserve fund is exhausted. Does not this provision bring this policy strictly within the language and meaning of section 5860, Revised Statutes 1889, which provides that if " the payment of the benefit (provided by the contract of insurance) *is in any manner or degree* dependent upon the collection of an assessment upon persons holding similar contracts, it shall be deemed a contract of insurance upon the assessment plan ?"

While the amount of the benefit is absolutely fixed and the assessments are definite sums estimated to be sufficient to realize the amount promised, yet it is obvious that in this safety clause is a provision by which an extra assessment or assessments may be made and power is vested in the executive board to make the levy and the liability of all the members to respond pro rata is fixed.

It seems to us this policy meets every requirement of the statute as to insurance on the assessment plan.

In Jacobs v. Life Association, 146 Mo. loc. cit. 539, the policy failed because there was no authority to any person or persons to levy such assessments for the payment of the policy nor imposing any duty upon the members to pay and for no specific purpose. Whereas, in this case, the executive board is authorized to levy pro rata upon the members additional assessments to pay the losses, and the two contracts are distin-

guishable.   It is perfectly obvious that the decision in Thass-
ler v. Life Assn., 67 Mo. App. 505, in nowise militates against
the conclusion we have reached, because in that case there was
no element of assessment.   Neither do we collide with the de-
cision in Toomey v. Supreme Lodge K. P., 147 Mo. 129, for
in that case it is pointed out by Judge MARSHALL that no pro-
vision whatever was made for a change in the amount of pre-
miums and the sum contracted to be paid on the death of the
assured was "in no manner or degree dependent upon the col-
lection of an assessment upon the other members of the associa-
tion."   Whereas, the additional assessment is expressly pro-
vided for in the policy under consideration.

The more recent cases decided by this court of McDonald
v. Bankers' Life Assn., 55 S. W. 999, and Aloe v. Fidelity
Mut. Life Assn., are distinguishable from the case at bar.   In
the first above-mentioned case, the court, per MARSHALL, J.,
says, in speaking of the policy in suit: "It is clear that some
amount in addition to the $69 and the $46 paid and deposited
when the policy was issued, is required to be paid quarterly,
but it does not appear that any amount is to be gauged by the
amount assessed against other persons similarly situated." The
policy in the case at bar, as has already been shown, does so
provide.

In Aloe v. Fidelity Mut. Life Assn., the court, speaking
through the same learned judge of the policy there in question,
says: "The conditions as to the mortality fund expressly state
that the premiums to be paid are based upon the mortality ex-
perience of life insurance companies, and that, if the amount
specified in the policy is not sufficient, the company reserves
the right to increase the premium, and also expressly states
that the equation fund is a surplus calculated upon like ex-
perience; but in this event, and in no other event, is the amount
to be paid by the company made to depend in any way upon

the collection of assessments upon persons holding similar policies. In other words, each contract with each insurer is a separate contract unto itself, wholly independent of any other contract made with any other insurer."

Our conclusion is that the defendant corporation by its charter is an insurance company doing business on the assessment plan and had authority to transact business as such in this State, and the policy in suit is a policy on the assessment plan.

IV. Having reached the conclusion that the policy in suit is an insurance contract on the assessment plan, and this court having uniformly ruled that insurance companies doing business on the assessment plan are not subject, under section 5869, Revised Statutes 1889, to the provisions or requirements of the general insurance laws of this State except as distinctly set forth, "and that this proviso does not require an insurance company on the assessment plan to show as a defense that the insured contemplated suicide at the time he or she applied for his or her policy (Haynie v. Knights Templar and Masons Indemnity Co., 139 Mo. 416), and the policy in this case having been issued and the loss having occurred prior to the passage of the Act of 1897 bringing assessment companies within the provisions of the general insurance law concerning suicides (section 5855, Revised Statutes 1889; Laws of Missouri 1897, p. 130; Revised Statutes 1889, sec. 5869; Revised Statutes 1899, secs. 7896 and 7910), it must be ruled that the liability of defendant must be determined by the law in force at the time of the issuing of the policy and the death of the insured, March 2, 1896, and that the provision in the policy that "if the insured within the period of three years from (its) date die by her own hand, whether sane or insane, this policy shall be null and void except as to payments made thereon with interest," was a valid and binding agreement, and

suicide within the three years after the date of the policy, a complete defense to this action. [Haynie v. Indemnity Company, 139 Mo. 416.]

On this point the evidence introduced by plaintiff herself, established beyond a peradventure that the assured, Miss Elliott, deliberately committed suicide on March 2, 1896, after taking out the policy on December 30, 1895, and the instruction in the nature of a demurrer to the evidence should have been sustained.

V. The court erred in not giving instruction numbered 3 prayed by defendant, and defendant was clearly entitled to instructions numbered 4 and 5 under the evidence adduced.

For the errors noted the judgment is reversed and the cause is remanded to the circuit court with directions to enter judgment for the defendant.

*Sherwood, P. J.,* and *Burgess, J.,* concur.