**ESTATE OF Charlotte A. FOLENO, by Ronald G. THOMAS, Co–Personal Representative, Appellant–Plaintiff,**

v.

**ESTATE OF Billy J. FOLENO; Craig T. Benson, as Personal Representative of Estate of Billy J. Foleno; Cigna Corp., d/b/a Connecticut General Life Insurance Company; Keith Foleno; Rick Foleno; Barry Foleno; and Occidental Petroleum Company, Appellees–Defendants.**

No. 76A05–0111–CV–496.

Court of Appeals of Indiana.

July 30, 2002.

Christopher J. Wheeler, Stout & Wheeler, LLP, Angola, IN, Attorney for Appellant.

J. Frank Stewart, Angola, IN, Attorney for Appellees.

## OPINION

BAKER, Judge.

Today we are asked to impose a constructive trust on proceeds of a life insurance policy in favor of the heirs of a woman killed by her husband, in clear contravention of the terms of the insurance contract. The trial court ruled that the terms of the insurance contract should prevail and so awarded the proceeds to the policy's contingent beneficiaries. We affirm.[1]

Appellant-plaintiff Ronald Thomas, co-personal representative of the Estate of Charlotte Foleno, appeals the trial court's award of insurance proceeds to appellees-defendants Keith, Rick, and Barry Foleno (the Foleno brothers)—contingent beneficiaries of a policy insuring the life of Billy J. Foleno. They were contingent beneficiaries in the event Billy survived his wife Charlotte, the primary beneficiary. Rules of equity, long-standing contract law, and well-established property transfer law favor the distribution of the proceeds according to the terms of the insurance policy.

## FACTS

On the morning of July 15, 2000, Billy Foleno found his wife of thirty-five years, Charlotte Foleno, and her companion, Barry Crowle, at a Holiday Inn hotel room in Fremont, Indiana. Armed with a .45 caliber automatic pistol, Billy shot Charlotte at least three times as she ran from the hotel room into the hallway. Following her into the hallway, Billy shot Charlotte in the head. He then returned to the room and shot Crowle, who survived the attack. Believing that he killed both Charlotte and Crowle, Billy ended his own life. The parties agree that Charlotte died before Billy.

Billy owned a life insurance policy carrying a death benefit of $40,000, designating Charlotte as the primary beneficiary. In the event there was "no designated beneficiary living at the death of the insured," the insurance company would "pay the benefits to the persons surviving the Insured who are listed in the order they appear:"

1. first the Insured's spouse;
2. next the Insured's children;
3. next the Insured's parents;
4. next the Insured's brothers and sisters.

Appellant's App. p. 17. Under the terms of the policy, Billy was the insured. Both Charlotte and Billy died intestate with no children. Billy was survived by his three brothers, Rick, Keith, and Barry Foleno (the Foleno brothers).

On April 25, 2001, Ronald Thomas, a co-personal representative of Charlotte's estate, filed a Verified Complaint for Imposition of Constructive Trust and Injunction against the Estate of Billy J. Foleno, its personal representative, Craig T. Benson, Cigna Corp., d/b/a Connecticut General Life Insurance, the Foleno brothers, and Occidental Petroleum. Over three months later, Thomas filed a motion for summary

---

1. Oral argument was heard in this cause on June 18, 2002, in Indianapolis. We extend our gratitude to counsel for their succinct briefing of the issue and excellent oral presentations. We also express our appreciation for the Honorable Allen N. Wheat's findings. Though findings of fact are not controlling in the summary judgment context, they can be, and in this case were, helpful in our disposition of the cause.

judgment, and the Foleno brothers subsequently filed a cross-motion for summary judgment. The parties disputed none of the material facts before the trial court. After a hearing, the trial court granted the Foleno brothers' motion for summary judgment and denied the motion made by Thomas. In so doing, the trial court ordered the insurance proceeds, which had been deposited with the clerk of the court by Connecticut General Life Insurance Company, paid to the Foleno brothers. Thomas now appeals the award[2] of the insurance proceeds to the Foleno brothers.

## DISCUSSION AND DECISION

### I. Standard of Review

■■■ The parties agree to the material facts of this case. Accordingly, our task on review is to determine whether the trial court correctly applied the law to the undisputed facts. *Fox v. Hawkins*, 594 N.E.2d 493, 495 (Ind.Ct.App.1992). Appellate courts review questions of law under a de novo standard and owe no deference to a trial court's legal conclusions. *Wayne Metal Prods. Co. v. Ind. Dep't of Envtl. Mgmt.*, 721 N.E.2d 316, 317 (Ind.Ct.App. 1999), *trans. denied.*

### II. Application of the Slayer's Rule Where Killer Is the Insured

■■ Thomas raises the sole issue of whether equity imposes a "constructive trust" on the proceeds from Billy's insurance policy. Thomas claims that equitable principles of constructive trust should apply here to prevent Billy or the contingent

beneficiaries of the insurance policy from benefiting from his wrongful acts.

There is no dispute that the insurance contract named Charlotte as the primary beneficiary and provided three additional classes of contingent beneficiaries in the event Charlotte predeceased Billy. Billy had no children (second class) and his parents (third class) predeceased him. Therefore, the proceeds were to be paid to the fourth and final class of beneficiaries— Billy's brothers. Indeed, Thomas concedes that the terms of the insurance contract plainly direct payment of proceeds to the Foleno brothers.

Because the policy terms plainly afford no relief, Thomas seeks to extend equity to impose a constructive trust on the proceeds. Reviewing the history of and reasons for the equitable principle invoked— that is, the Slayer's Rule—shows that the rule has no application to the facts of the instant case.

The Slayer's Rule is of recent origin compared to other property rules whose roots are often embedded in feudalism. "In England, the common law doctrines of attainder, forfeiture, corruption of blood and escheat played a prominent part in the solution of the problem of the slayer and his bounty." Alison Reppy, *The Slayer's Bounty—History of Problem in Anglo-American Law*, 19 N.Y.U. L.Q. Rev. 229, 244 (1942). Application of these doctrines usually resulted in the Crown taking a murderer's property upon conviction, thus, destroying the line of descent. *Ballard v. Bd. of Trustees of the Police Pension Fund*, 263 Ind. 79, 86, 324 N.E.2d 813, 817

---

**2.** Although the trial court granted the Foleno brothers summary judgment on October 17, 2001, it did not expressly enter final judgment on the claim until November 16, 2001, in a nunc pro tunc order. Appellant's App. p. 7. The trial court's November 16 order had the legal effect of making the entry of final judgment on the insurance claim retroactive to October 17, 2001. In accordance with Ind. Trial Rule 54(B), the trial court determined that there was "no just reason" for delaying the entry of judgment. As a result, an appeal could be taken on the claim for insurance proceeds before the resolution of all the claims as to all the parties.

(1975); Reppy, *supra*, at 241. Soon after the founding of this nation, these ancient doctrines were constitutionally and statutorily abolished. Reppy, *supra*, at 244. They were also eventually abolished in England. *See* Marie Louise Fellows, *The Slayer Rule: Not Soley a Matter of Equity*, 71 Iowa L.Rev. 489, 540 n. 157 (1986) (citing Forfeiture Act of 1870, 33 & 34 Vict., ch. 23, para. 1).

Although the doctrines had the cruel effect of extinguishing the inheritance rights of a killer's innocent heirs, they provided one unintended benefit: separating a killer from his victim's property. The abolishment of attainder, forfeiture, corruption of blood, and escheat thus left an unanticipated void. No longer would the sovereign emerge to confiscate a killer's property, even when the killer acquired the property by means of his crime.

Two cases arising in the late-nineteenth century were the first to develop a judicial solution to the problem of a slayer attempting to profit from his victim through intestate succession, testate succession, or distribution of insurance proceeds. In *Mutual Life Insurance Co. of New York v. Armstrong*, an insurance company refused to pay proceeds on a policy that had been obtained by one who eventually killed the insured six weeks after procuring the policy. 117 U.S. 591, 6 S.Ct. 877, 29 L.Ed. 997 (1886). Reversing the trial court's judgment and ruling in favor of the insurance company, the Court wrote:

> [I]ndependently of any proof of the motives of Hunter in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired.

*Id.* at 600, 6 S.Ct. 877.

Three years later New York's highest court relied on *Armstrong* in part to deny a sixteen-year-old grandson from taking through his grandfather's will. *Riggs v. Palmer*, 115 N.Y. 506, 22 N.E. 188 (1889). When he learned that his grandfather intended to revoke provisions in the will favoring him, the grandson poisoned him. *Id.* at 189. According to the *Riggs* majority, a fundamental maxim of common law trumped both the probate code and the terms of the will, which would have awarded the grandson the victim's property. *Id.* at 190. The maxim was stated: "No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Id.* The court believed that this equitable principle had been applied in *Armstrong* and was just as applicable to the will under question. *Id.* In the end, the grandson was barred from taking any of the property through the will. *Id.* at 191.

Many states, including Indiana, codified the rule enunciated in *Riggs* in one form or another.[3] The General Assembly passed the following in 1907:

> That no person who unlawfully causes the death of another and shall have been convicted thereof, or aids or abets in such unlawful killing of another, shall take by devise or descent any part of the

---

**3.** Within fifty years of the *Riggs* decision, thirty-six states and the District of Columbia had codified some form of the Slayer's Rule. *See* John W. Wade, *Acquisition of Property by Wilfully Killing Another—A Statutory Solution*, 49 Harv. L.Rev. 715, 715 n. 1 (1936).

property, real or personal, owned by the decedent at the time of his or her death. Act of Mar. 2, 1907, ch. 95, § 1, 1907 Ind. Acts 136 (codified at Burns Ind. Stat. Ann. § 2995 (Bobbs–Merrill 1908)). The 1907 statute was substantially amended in 1953.[4] The amendment declared that a person "legally convicted of intentionally causing the death of another" became a "constructive trustee" of any property acquired from the decedent or the decedent's estate. Act of Mar. 9, 1953, ch. 112, § 212, 1953 Ind. Acts 309 (codified at Burns Ind. Stat. Ann. § 6–212 (Bobbs–Merrill 1953 Repl.)).

As the trial court here noted, the General Assembly was not alone in developing the Slayer's Rule in Indiana. This court recognized, both before and after the 1953 amendment, that a beneficiary forfeits insurance proceeds when he "intentionally and wrongfully" causes the death of the insured. *See Beene v. Gibraltar Indus. Life Ins. Co.*, 116 Ind.App. 290, 292, 63 N.E.2d 299, 300 (1945) (concluding that there was no proof that beneficiary intentionally and wrongfully killed the insured); *Stacker v. Mack*, 126 Ind.App. 95, 102, 130 N.E.2d 484, 487–88 (1955) (same); *United*

*Farm Bureau Family Life Ins. Co. v. Fultz*, 176. Ind.App. 217, 225, 375 N.E.2d 601, 607 (1978) (permitting insurance company to withhold insurance proceeds from a beneficiary suspected of having murdered the insured until criminal and civil findings of nonguilt were established); *N.Y. Life Ins. Co. v. Henriksen*, 415 N.E.2d. 146, 149 (Ind.Ct.App.1981) (relieving insurance company of any liability on an insurance contract where sole owner and sole beneficiary of the policy was convicted of voluntary manslaughter in the death of the. insured). A 1984 amendment to the Indiana Code specified that a killer became a constructive trustee of "any property" he was "entitled to receive as a result of the decedent's death." *See* Act of Mar. 1, 1984, Pub.L. No. 147–1984, 1984 Ind. Acts 1277 (codified at Ind.Code Ann. § 29–1–2–12.1(a) (Michie Supp.1984)). Our supreme court held that section 12.1(a) had codified the forfeiture-of-proceeds rule. *Estate of Chiesi v. First Citizens Bank, N.A.*, 613 N.E.2d 14, 14 (Ind. 1993). Hence, the *Riggs* and *Armstrong* rules announced in the 1880s had been codified in the same Indiana statute[5] almost one hundred years later.

4. The full amendment read:

> A person who shall have been legally convicted of intentionally causing the death of another, or of aiding or abetting therein, shall, in accordance with the rules of equity, become a constructive trustee of any property, real or personal, acquired by him from the decedent or his estate because of such death, for the sole use and benefit of those persons legally entitled thereto other than such guilty person, saving to all innocent purchasers for value interests therein acquired in good faith. Such conviction shall be final and conclusive in any subsequent suit to charge him as such constructive trustee.
>
> Act of Mar. 9, 1953, ch. 112, § 212, 1953 Ind. Acts 309 (codified at Burns Ind. Stat. Ann. § 6–212 (Bobbs–Merrill 1953 Repl.)).

5. Both parties agree that Indiana's latest version of the Constructive Trust Statute does not apply. Under that provision:

> A person is a constructive trustee of any property that is acquired by him or that he is otherwise entitled to receive as a result of a decedent's death, *if that person has been found guilty, or guilty but mentally ill, of murder, causing suicide, or voluntary manslaughter, because of the decedent's death.* A judgment of conviction is conclusive in a subsequent civil action to have the person declared a constructive trustee.
>
> Ind.Code Ann. § 29–1–2–12.1(a) (West 1999) (emphasis supplied). Once a constructive trust is established, "the property that is subject to the trust may be used only to benefit those persons, other than the constructive trustee, legally entitled to the property, determined as if the constructive trustee had died

As made clear by our supreme court in *National City Bank of Evansville v. Bledsoe,* equity principles will operate in place of the Constructive Trust Statute when the killer's suicide makes a criminal conviction impossible. 237 Ind. 130, 144 N.E.2d 710 (1957). In *Bledsoe,* a husband murdered his wife and then committed suicide. *Id.* at 133, 144 N.E.2d at 711. The issue before the *Bledsoe* court was the proper disposition of the property held by the couple in a tenancy by the entireties. *Id.* at 133, 144 N.E.2d at 711. After determining that the then-existing Constructive Trust Statute did not apply—because prosecution for the murder was not possible and the husband could not have acquired the property through inheritance—our supreme court looked to equitable principles. *Id.* at 137, 144 N.E.2d at 713.

It began with the major premise that "equity will not permit a person to profit by his own wrong at the expense of another." *Id.* at 138, 144 N.E.2d at 714. The minor premise was formulated as: "the murderer in reality has profited from illegally causing the death of the victim spouse, as he has become the sole and exclusive owner of the fee, which he could thereupon alienate or dispose of as he alone saw fit." *Id.* at 138, 144 N.E.2d at 714. Reasoning from those premises, the supreme court concluded, "[T]he murderer or his estate should not in equity be permitted to take and keep the entire interest in fee in the property which he has thus acquired by his wrongful act." *Id.* at 139, 144 N.E.2d at 714. So, where a tenancy by entireties is dissolved by murder, "the murderer becomes a constructive trustee for the victim's estate in one-half of the property." *Id.* at 140, 144 N.E.2d at 715.

*Bledsoe* is relevant to the instant case for two reasons. First, our supreme court determined that the Constructive Trust Statute and the rules of equity work in tandem. In other words, the Constructive Trust Statute was intended "to supplement the prevailing equity rule" not "to supersede it." *Id.* at 141, 144 N.E.2d at 715. Second, the killer does not lose his undivided half interest in the tenancy by the entireties, only the victim's half. Examining the treatment of the tenancy by other states, the *Bledsoe* court listed five possible outcomes, one of which was imposition of a constructive trust on the entire tenancy. *Id.* at 136, 144 N.E.2d at 713. The court observed, however, if the tenancy ended by divorce, each spouse would receive half of the property. *Id.* at 140, 144 N.E.2d at 714. It reasoned that the property consequences should be similar when a husband ends the marriage by killing his wife. *Id.* at 140, 144 N.E.2d at 715. As a result, the killer receives an undivided one-half interest in the tenancy. To deprive the killer of his half of the tenancy through a constructive trust would impose an unconstitutional forfeiture. *See id.* at 142, 144 N.E.2d at 716 ("In fact, the murderer is not deprived of any property which he obtained in any other way than through the murder; he is merely prevented from enriching himself by acquiring property through the murder."). To sum up, although rules of equity supplement the Constructive Trust Statute, they do not extend so far as to deprive the killer of his own property.

An insurance contract is considered personal property:

It is well settled in Indiana that a policy of insurance is a chose in action with which *the insured can do with or*

immediately before the decedent." I.C. § 29–1–2–12.1(c). The Constructive Trust Statute is inapplicable because Billy took his life, removing any possibility of a murder conviction.

*dispose of, as he pleases,* in the absence of prohibitory legislation or contract stipulations. *The policy has all the characteristics of personal property* and can be delivered and transferred as other personal property.

*Elliott v. Metro. Life Ins. Co.,* 116 Ind. App. 404, 420, 64 N.E.2d 911, 917 (1946) (emphases added) (collecting cases); *accord* 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 1.39 (1997) ("A life insurance policy is property, in the nature of a nonnegotiable chose in action even before the death of the insured. As personal property, the policy ... may, in the absence of contrary legislation or contract provision, be delivered and transferred as other personal property."). An insured is the rightful owner of the contractual rights and obligations contained in a life insurance policy up to the time of his death. *See Olinger v. Northwestern Mut. Life Ins. Co.,* 153 Ind.App. 376, 386, 287 N.E.2d 580, 585 (1972).

Here, as the trial court observed, neither Billy nor his estate acquired property through Charlotte's killing. Billy purchased the insurance policy in 1986 to insure his life and, it is undisputed, paid the requisite premiums throughout the life of the policy. As the owner of the policy and the one whose life it insured, Billy paid for and enjoyed the exclusive right of choosing the beneficiaries.

One might sensibly ask whether courts should busy themselves with upholding the property rights of those like Billy who commit such iniquity. Our sympathy naturally leads us to prefer the victim and her estate to the killer. But our sympathy is not the proper touchstone for adjudicating litigant rights and interests. *See* Herbert Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 Harv. L.Rev. 1, 12 (1959). Instead, courts are to render decisions based on legal principles. A principled decision "is one that rests on reasons with respect to all the issues in the case, reasons that in their generality and their neutrality transcend any immediate result that is achieved." *Id.* at 19.

In an effort to create a legal principle, Thomas relies heavily on *Heinzman v. Mason,* 694 N.E.2d 1164 (Ind.Ct.App. 1998), *trans. denied,* but neither its holding nor underpinnings allow us to rewrite the terms of a binding contract. It is undeniable that the facts of *Heinzman* are similar to those presented in the instant case. A husband shot and killed his wife and, shortly thereafter, killed himself. 694 N.E.2d at 1166. However, in *Heinzman,* the killer was the sole beneficiary of the insurance policy and the victim the insured. *Id.* We held that, because the killer's wrongdoing caused the insured's death and put him in a position to benefit from that death, neither he nor his estate was eligible to receive the proceeds. *Id.* at 1166, 1167.

*Heinzman* differs from the instant case in two important respects. First, the victim was the insured and the killer the sole beneficiary in *Heinzman.* So his act of killing the victim conferred an automatic benefit on himself and his heirs. Indeed, as we reviewed earlier, Indiana courts have long held to this position.[6] Here, Billy was the insured and policy owner

---

6. *See, e.g., Stacker,* 126 Ind.App. at 102, 130 N.E.2d at 487 (recognizing the rule that "a beneficiary in a life insurance policy who intentionally and wrongfully causes the death of the insured forfeits all rights which he may have in or under the policy of insurance"); *Beene,* 116 Ind.App. at 292, 63 N.E.2d at 300 (same); *see also* Annotation, *Killing of Insured by Beneficiary as Affecting Life Insurance or Its Proceeds,* 27 A.L.R.3d 794, 802–05 (1969 & Supp.2001) (listing thirty-six states, including Indiana, which have followed the *Armstrong* forfeiture-of-proceeds rule).

with the power to change the beneficiaries at any time. Thus, it was not necessary that Billy kill Charlotte so that his brothers could recover the proceeds. Second, upon the killer's death in *Heinzman*, the proceeds went to his heirs by way of intestate succession. In the instant case, the Foleno brothers are beneficiaries of the policy itself, and they take according to the terms of the contract—not by intestate succession.

At least two other state courts have come to the same conclusion we reach today, namely: insurance policy proceeds will be distributed to contingent beneficiaries where the insured intentionally kills the primary beneficiary, as long as the contingent beneficiaries are in no way responsible for the killing.

New York's highest court held that an insurance policy was the killer's own property both before and after the primary beneficiary's death. *In re Estates of Covert & Another, Deceased*, 97 N.Y.2d 68, 735 N.Y.S.2d 879, 761 N.E.2d 571, 577 (2001). Because the contingent beneficiaries of the policy were innocent distributees of the policy, they were entitled to take pursuant to the terms of the insurance contract. *Id.* The court—the same court that sparked the nationwide revolution in *Riggs* over one hundred years earlier—reasoned that it "had never applied" equitable principles "to cause a wrongdoer's forfeiture of a vested property interest." *Id.* at 575.

Likewise, Maryland's highest court ruled in favor of contingent beneficiaries of an insurance policy where the killer was the insured (who killed himself after killing his wife) and the primary beneficiary was the victim. *Diep v. Rivas*, 357 Md. 668, 745 A.2d 1098 (2000). In *Diep*, the contingent beneficiaries were said *not* to:

claim in the right of [the killer]. They claim based on the promise made by [the insurance company] to pay 'the surviving person or persons in the first of the following classes of successive preference beneficiaries of which a member survives the Insured.' Their claim is in their own right as contingent beneficiaries under the contract of insurance.

. . . .

... [The killer's] default selection of contingent beneficiaries seems to have been made more than five years before the murder. What is more important, there is not a suggestion that the [contingent beneficiaries] were accomplices in that crime. Further, even if one assumes that a motive on the part of the murderer to benefit innocent contingent beneficiaries were relevant, there is no evidence of such a motive presented here.

*Id.* at 1104–05. In short, the contingent beneficiaries were in no way responsible for the killing and, thus, were entitled to the insurance proceeds based on their rights under the insurance contract.

In the instant case, Thomas makes no argument that the Foleno brothers were in any way responsible for Charlotte's death. He proposes, nevertheless, that we deny them their rights under the insurance contract by creating the legal fiction that Billy predeceased Charlotte. The Slayer's Rule does impose this legal fiction to prevent the killer and his heirs from enriching themselves through the victim's property. Imposing the rule here, however, would introduce significant line-drawing problems. For instance, had Billy killed Charlotte and then killed himself a day later, would equity still divert the proceeds to Charlotte's estate? If Billy had died naturally twenty years later, long after Charlotte's estate had been closed, would equity step in and redirect the proceeds to those who would have been Charlotte's intestate

heirs? If so, which heirs: her living heirs at the time of Billy's death or the heirs who were alive at the time of Charlotte's death (allowing their heirs to take)? Finally, there is no principled reason to hand over the insurance proceeds yet stop short of Billy's remaining property interests, including his real and personal property. At Billy's demise years later, under Thomas's proposed legal principle, a constructive trust should be imposed on his real and personal property as well as the insurance proceeds. Such are the unintended consequences of allowing sympathy to cloud principled decisionmaking.

## CONCLUSION

As contingent beneficiaries, the Foleno brothers are entitled to the insurance proceeds. First, applying broad equitable principles to rewrite the insurance contract in this case does not advance the purpose for the principles: to prevent a killer or his heirs from profiting through a victim's property. Second, as the insured and owner of the policy, Billy had a vested interest in choosing the beneficiaries in the event of his death. Imposing a constructive trust on the proceeds would be a deprivation of this property interest and would run counter to our supreme court's general rule laid down in *Bledsoe,* that a killer does not forfeit his own property interests. Third, imposing the Slayer's Rule in these circumstances would introduce confusion, arbitrariness, and uncertainty into well-established property transfer laws. For these reasons, the trial court correctly applied the law to the facts, and we affirm its summary judgment in favor of the Foleno brothers.[7]

Affirmed.

---

**7.** We note that our decision today has no effect on a wrongful death action against Bil-

DARDEN, J., concurs.

SULLIVAN, J., dissents with opinion.

SULLIVAN, Judge, dissenting.

Billy Foleno's heinous murder of his wife eliminated her not only as the primary beneficiary of the life insurance policy but as well from the face of the earth. Were it not for this criminal act, the Foleno brothers would not have any claim to the insurance proceeds. The criminal act therefore benefited the brothers.

Here, but for their heirship status as the brothers of the murderer, they would not be beneficiaries under the insurance contract. For this reason I am unable to subscribe to the distinction drawn by the majority as to a claim to the proceeds "according to the terms of the contract— not by intestate succession." Slip opinion at 497–98.

Notwithstanding the powerful force of the majority's historical analysis and solid reasoning, principles of equity compel my view that we should apply this court's decision in *Heinzman v. Mason,* 694 N.E.2d 1164 (Ind.Ct.App.1998). There we held that a constructive trust should be employed to prevent not only the wrongdoer from benefiting but to prevent the wrongdoer's heirs from benefiting even where the heirs are completely without fault.

I would reverse and remand with instructions to grant summary judgment in favor of the Estate of Charlotte Foleno.